SOUTHWESTERN BELL TELEPHONE CO. v. STATE et al.

No. 34440.   March 8, 1951.

*230 P. 2d 260.*

Cantrell, Carey & McCloud, Oklahoma City, Ronald J. Foulis, St. Louis (Earl H. Painter, St. Louis, of counsel), for appellant and plaintiff in error.

James G. Welch, Choice D. Holden, and D. C. McCurtain, Oklahoma City, for appellee and defendant in error.

McNAUGHTON, Special J. On September 30, 1947, Southwestern Bell Telephone Company filed with the Corporation Commission of the State its petition for increased rates to be charged in the state for intrastate service. After the taking of considerable testimony the Company filed with the Commission its application for a temporary rate pending the determination of the permanent rate, and upon denial of the application by the Commission, appealed to this court, which granted supersedeas pursuant to which it placed in effect rates designed to produce annually the sum of $3,077,661. Southwestern Bell Telephone Co. v. State of Oklahoma ex rel. Corporation Commission, 202 Okla. 291, 214 P. 2d 715. Thereafter additional testimony was taken before the Commission, and on October 17, 1949, the Commission made its report and order, granting a permanent rate of 5¼ per cent, this being the earning allowed by the Commission upon a rate base arrived at by subtracting from the book value of the Company's property in Oklahoma used in its intrastate business, that portion of its reserve for depreciation allocated to the intrastate portion of its business. The Company has perfected its appeal from this or-

der, urging that the rate of return fixed by the Commission is insufficient and confiscatory; that in making it the Commission disregarded the evidence produced before it, and that the rate fixed is wholly unsupported by any evidence which the Commission had before it.

In its assignments of error and argument, the Company asserts that the order of the Commission takes its property without just compensation contrary to the 5th and 14th Amendments of the Constitution of the United States, and contrary to sections 23 and 24 of Art. 2 of the State Constitution; that it deprives the Company of its property and rights without due process of law contrary to the 14th Amendment of the Constitution of the United States and to section 7 of art. 2 of the State Constitution, and that it denies to the Company the equal protection of the laws in violation of the 14th Amendment of the Constitution of the United States, and section 2 of art. 2 of the State Constitution.

Article 9, sec. 20 of our Constitution, as amended by the Laws of 1941, provides in part as follows:

"The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts."

In view of the asserted violation of the Company's constitutional rights, we have, pursuant to the constitutional requirements set forth above, carefully examined the record in this case and the applicable law, and this opinion reflects the exercise of our independent judgment pursuant to our study of the record and the governing decisions.

The record filed in this court is very voluminous, there being eight volumes of testimony consisting of some 3,858 pages, and four volumes of exhibits.

This testimony was extensive in range, covering not only the reasonableness of the expenses of the Company incurred in rendering the service it at present renders to the citizens of this state and its plans for expansion and improvement in service, but also outlining in detail the financial situation of the Southwestern Bell Telephone Company, and the financial structure and condition of the American Telephone & Telegraph Company, which according to the record owns and holds all of the capital stock of the Southwestern Bell Telephone Company except a few qualifying shares, and advances to the Southwestern Bell Telephone Company the greater portion of the funds used or to be used by it in expanding and improving its service in the various states served by it. There was also considerable testimony as to the fluctuating character of the telephone business when compared to the business of other public utilities, such as light, gas, and water companies, and the rates of return upon the investments of such companies in comparison to the rates earned by the telephone companies. There was also a large amount of evidence produced by the Company concerning the ratio of the indebtedness, both of Southwestern Bell Telephone Company and of American Telephone & Telegraph Company, to their total capitalization.

The Company contended before the Commission and here contends that in order to produce a fair and reasonable rate upon its intrastate investment in the State of Oklahoma, and to avoid confiscation, a rate of not less than 7 per cent upon its invested capital is required. In its report the Commission adopted as the rate base, or the amount of investment upon which the Company was entitled to earn an adequate return, the book value of the Company's investment in the intrastate business in Oklahoma less that portion of the Company's reserve for depreciation which could be allocated to its intrastate business. To this amount it added the value of materials and supplies on hand to be used in the improvement and expansion of the Company's business, and that portion of the Company's cash working capital allocated to intrastate business, making a total of $53,475,000. Upon this rate base it allowed a rate which, after the payment of operating expenses, taxes, and yearly depreciation, income taxes, uncollectables, and additional gross receipts taxes, would leave the Company the sum of $2,807,437, a net return to the Company of $5\frac{1}{4}$ per cent on the rate base above specified. While it conceded that the public utilities commissions, or the courts of other states, whose decisions had been examined by it, allowed rates in excess of that fixed, it stated that while not criticizing the allowance of such rates it felt that $5\frac{1}{4}$ per cent was a fair, just, and reasonable return from intrastate operations in Oklahoma.

In considering various expenditures incurred by the Company in connection with its business, such as license contract payments to American Telephone & Telegraph Company for services and research work performed by it for its various subsidiaries, the prices charged for material and equipment by Western Electric Company, another subsidiary of American Telephone & Telegraph Company, depreciation rates used by the Company, pension fund accruals, maintenance expenses, and working capital requirements, the Commission, while finding that there was not sufficient testimony to support a finding that the expenses so incurred by the Company, or that the depreciation rates, working capital requirements, or pension fund provisions were excessive or unreasonable, expressed dissatisfaction with the amounts allowed, and in each case stated that the allowance of this amount was an intangible element which had been considered by the Commission in arriving at its conclusion as to a fair rate of return. By this statement, as we construe it, it intimated that in its judgment the

charges, expenses, rate of depreciation, amount of working capital on hand, and pension fund arrangement were excessive, or to some unascertained and undeclared extent unnecessary. It stated that while it could consider only the intrastate operations in Oklahoma and the amount which such operations should contribute to the overall requirements of Southwestern Bell Telephone Company, it was a known fact that certain areas in the United States contributed more proportionately to the overall return from interstate business than did others, and that the same was true of intrastate rates where the state is the rate-making unit, and that certain states and areas, such as large centers of population, like St. Louis, Kansas City, Dallas, and Houston, should contribute more proportionately to such intrastate business than should less favorably situated areas.

In fixing the rate of return the Commission noted that the Company, in support of its contention that it was entitled to a net return of 7 per cent on the net value of its property, introduced a great mass of evidence relating to the Bell System as a whole, or to the American Telephone & Telegraph Company, and stated that it was not concerned with the overall requirements of the Bell System, or American Telephone & Telegraph Company, but was concerned only with the requirements of the Southwestern Bell Telephone Company. Yet in demonstrating the sufficiency of the return to the Southwestern Bell Telephone Company from the 5¼ per cent rate allowed, it noted the fact that from the testimony it appeared that the debt ratio of the Bell System, that is, the amount of its indebtedness in relation to the value of its invested capital, was some 50.8 per cent, while the ratio of debt capital to total capital for the Southwestern Bell was only 34.6 per cent, and stated that in view of the low cost of debt capital the latter company should take advantage of conditions by borrowing up to the limits of safety. It then assumed that a debt ratio of 40 per cent for the

Company would be safe, and by applying the return from the rate allowed to the payment of interest on the debt capital, and the balance as dividends upon its equity or stock capital, demonstrated that the Company could pay a dividend upon the par value of its capital stock, representing 60 per cent of the rate base above, of approximately 6 2/3 per cent, which it stated was the rate of yield on the book value of the common stock of American Telephone & Telegraph Company. It found that the amount of money which the Company would receive from the 5¼ per cent rate was sufficient to service the interest requirement on the 40 per cent borrowed capital, and leave an amount which would enable it to pay dividends of 6 2/3 per cent on the 60 per cent equity capital represented by its stock, and by an appropriate order placed in effect rates designed to yield to the Company the net amount of $2,807,437, above mentioned.

From the evidence it appears that the Company's principal source of money with which to improve and expand its service within the State is American Telephone & Telegraph Company, and the testimony of numerous witnesses as to the amount of return which would be required from the intrastate properties of the Company in order to pay its proportionate share of the amount necessary to be raised by the parent company was given consideration by the Commission. A number of witnesses, financial experts, and high officials of American Telephone & Telegraph Company testified that the bonded indebtedness of that company, which had increased beyond 50 per cent, had already impaired its credit to some extent, and that to keep its stock on a basis which would compare favorably with that of other utilities and enable it to attract investors in its common stock, a return of not less than 7 per cent on the invested capital of its subsidiaries was essential. These witnesses testified that in many instances the rates of return allowed by the various public utilities commissions were in-

sufficient to permit the companies to accumulate a surplus out of which its bonded indebtedness could be retired, and that such retirement must be affected principally by equity capital or capital derived from the sale of its common stock, and that a rate of 7 per cent was necessary in order to make its stock attractive to investors and give them confidence in its financial stability so as to make its common stock a desirable investment.

It also appears that the dividend return of the parent company, which witnesses testified had done much to hold its position with the public as a desirable investment, was the sum of $9 annually, which represents 6.56 per cent on the book value of the parent company's common stock, as from the evidence it appears that the book value of the stock was $137 per share, while the par value was $100 per share.

The Oklahoma Commission having jurisdiction only as to Oklahoma intrastate operations was required to determine a fair rate of return upon the properties devoted to those operations. This prevents a comparison of the per share returns with those of the parent company, or with operations of Southwestern Bell Telephone Company in its other operations as well as in other states. The Commission found the net investment of Southwestern Bell Telephone Company property devoted to intrastate business in Oklahoma to be $53,475,000. This includes cash working capital, material and supplies, and is not in dispute as to net investment rate base and working capital. The ratio of debt capital to equity capital was found to be 34.6 per cent, which would be $18,502,350 debt capital, leaving equity capital of $34,972,650. The company says its interest rate is 2.96 per cent. This would fix a debt servicing charge on debt capital of $547,669. The Commission fixed $2,807,437, or 5¼ per cent on rate base, as annual return after taxes and operating expenses, as a fair return. After deducting the debt cost this leaves $2,259,768 as annual net

return upon the equity (book value). This net return divided by the stockholders' equity produces 6.46 per cent as compared to dividend, $9, rate upon claimed book value, $137 per share, of all 22 telephone companies (including Southwestern Bell Telephone Company) and other subsidiaries of 6.56 per cent. The record shows for 1947, being the last year covered in appellant's exhibit showing trend of market prices of American Telephone & Telegraph Company common stock, that the average price was $161.16 per share on 949,000 shares. This discloses that the equity investor would have a return of 5.5 per cent on his equity in the parent company. Much evidence by the Company is devoted to claimed necessity of a return to equity owners (stockholders) that will attract investors to the equity, or stock, as contrasted to debt participation. The witnesses of the Company set that necessary return as more than $9.86 per par $100 share. This evidence is related to the witnesses' opinion that it is necessary to maintain the $9 per share dividend rate of the parent company which it is said has continued for more than 25 years.

The Company urges the decrease of debt ratio from 34.6 to at least 33 1/3 as necessary to attract investors to its securities. The Bell System's debt ratio is said to be 50.8 and this record shows for it a lower debt cost (interest rate) than its subsidiary. This record shows that Southwestern Bell Telephone Company is not a small company, but operates in several states with many millions invested, and it would appear Southwestern Bell is carrying at least its share of attractiveness for investors from the standpoint of debt ratio as to that of parent. Since Southwestern Bell stock is almost, if not completely, controlled by American Telephone & Telegraph Company, there is no public market for it and any suggestion that it would not attract investors so as to increase the equity participation in this Oklahoma property, is, to say the least, highly problematical and not of suffi-

cient weight to base an opinion of un-attractiveness upon.

As of the date of the hearings the common stock of American Telephone & Telegraph Company was selling to yield 6 per cent. That is on a basis substantially higher than so-called book value upon which it is shown to earn substantially more. That values of the stock are largely based upon earnings is clear from the record. It seems equally clear that so long as equity capital earns in excess of 6 per cent the rates producing such earnings could not be said to be confiscatory.

The Company urges that the rate base fixed by the Commission was improper and that it is entitled to a rate upon the fair value of its property. We are unable to agree with this contention. In Lone Star Gas Co. v. Corporation Commission, 170 Okla. 292, 39 P. 2d 547, we said that there was more than one theory or formula which might be adopted and followed by rate-making bodies, and that none was exclusive or more favored than the others.

In Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 88 L. Ed. 333, 64 S. Ct. 281, the Supreme Court of the United States held that fair value was the end product of the process of rate making and not the starting point, and that rates cannot be made to depend upon fair value when the value of a going enterprise depends on earnings under whatever rates may be anticipated. It also calls attention to the fact that the Commission is not bound to the use of any single formula in determining rates, and that when the Commission's order is challenged in the courts, the question is whether that order, "viewed in its entirety," meets the requirements of the act. This rule is cited and approved in Cities Service Gas Co. v. Federal Power Commission (C.C.A. 10) 155 F. 2d 694, and in numerous other cases. In the Cities Service case, supra, the method followed in the instant case is stated to be in accord with the prevailing rule.

The Company also urges that the Commission erred in failing to include in the rate base the telephone plant under construction. The Commission asserts that a witness for the Company testified that interest on the account representing uncompleted projects under construction was charged by the Company as a part of the fixed capital cost, and that to permit it also to collect a rate on the investment would be to allow it a double rate. In support of its contention that the Commission properly excluded this account, the Commission cites Petition of New England Telephone & Telegraph Co., 115 Vt. 494, 66 Atl. 2d 135. We have been unable to find in the voluminous record any positive statement as to whether or not the Company charges interest on uncompleted projects, but from other decisions it appears that this is a common practice, and we therefore approve the action of the Commission in refusing to include this uncompleted work in the rate base.

The Company also complains that the Commission made no allowance for uncollectible accounts, but an examination of its order discloses that it took these into consideration in fixing the rate.

The ultimate question in this cause is as to whether the rate of return fixed by the Commission operates to confiscate appellant's property devoted to the public use. The problem involves both the rate base and the rate applied thereto. In Federal Power Commission v. Hope Natural Gas Co., 320 U. S. 591, 88 L. Ed. 333, 64 S. Ct. 281:

" . . . The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. Block v. Hirsh, 256 U. S. 135, 155-157, 65 L. Ed. 865, 870, 871, 41 S. Ct. 458, 16 A.L.R. 165; Nebia v. New York, 291 U.S. 502,

523-539, 78 L. Ed. 940, 948, 958, 54 S. Ct. 505, 89 A.L.R. 1469, and cases cited. It does, however, indicate that 'fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

"We held in Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 86 L. Ed. 1037, 62 S. Ct. 736, supra, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments'. Id. 315 U.S. p. 586, 86 L. Ed. 1049, 62 S. Ct. 736. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Id. p. 586. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. Cf. Los Angeles Gas & E. Corp. v. Railroad Commission, 289 U. S. 287, 304, 305, 314, 77 L. Ed. 1180, 1191, 1192, 1197; West Ohio Gas Co. v. Public Utilities Commission, 294 U. S. 63, 70, 79 L. Ed. 761, 768, 55 S. Ct. 316; West v. Chesapeake & P. Teleph. Co. 295 U.S. 662, 692, 693, 79 L. Ed. 1640, 1657, 1658, 55 S. Ct. 894 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. Cf. Railroad Commission v. Cumberland Teleph. & Teleg. Co., 212 U. S. 414, 53 L. Ed. 577, 29 S. Ct. 357; Lindheimer v. Illinois Tel. Co., supra. (292 U.S. pp. 164, 169, 78 L. Ed. 1191, 1193, 54 S. Ct. 658); Railroad Commis-

sion v. Pacific Gas & E. Co., 302 U.S. 388, 401, 82 L. Ed. 319, 32, 58 S. Ct. 334."

The burden of proving rates fixed by the Commission to be confiscatory is upon the party complaining, Southwestern Bell Telephone Company v. State, 181 Okla. 246, 71 P. 2d 747; Lindheimer v. Illinois Bell Telephone Co., 292 U. S. 151, 78 L. Ed. 1182. In the case last cited, the court aptly states what might well be the cause at bar:

"The case has long been pending and should be brought to an end. The Company has had abundant opportunity to establish its contentions. In seeking to do so, the Company has submitted elaborate estimates and computations, but these have overshot the mark. Proving too much, they fail of the intended effect. It is not the function of the court to attempt to construct out of this voluminous record independent calculations to invalidate the challenged rates. It is enough that the rates have been established by competent authority and that their invalidity has not been satisfactorily proved."

The question of when a rate is confiscatory and therefore unlawfully deprives a utility of its property is almost impossible of definite determination through the use of language. The factors are numerous and varied in their nature and effect. The Supreme Court, in Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 86 L. Ed. 1037, says:

"By long standing usage in the field of rate regulation the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense. Los Angeles Gas & E. Co. v. Railroad Commission, 289 U.S. 287, 305, 77 L. Ed. 1180, 1192, 53 S. Ct. 637; Railroad Commission v. Pacific Gas & E. Co., supra (302 U.S. 394, 395, 83 L. Ed. 323, 58 S. Ct. 334); Denver Union Stock Yard Co. v. United States, 304 U.S. 470, 475, 82 L. Ed. 1469, 1475, 58 S. Ct. 990. Assuming that there is a zone of reasonableness within which the Commission is free to fix a rate varying in amount and higher than a confiscatory rate, see Banton v. Belt Line R. Co., 268 U.S. 413, 422, 423, 69 L. Ed. 1020, 1026, 1027, 45 S. Ct. 534;

Columbus Gas & Fuel Co. v. Public Utilities Commission, 292 U.S. 398, 414, 78 L. Ed. 1327, 1336, 54 S. Ct. 763, 91 A.L.R. 1403; Denver Union Stock Yard Co. v. United States, supra (304 U.S. 483, 82 L. Ed. 1480, 58 S. Ct. 990), the Commission is also free under §5(a), 15 U.S.C.A. §717D (a) to decrease any rate which is not the 'lowest reasonable rate'. It follows that the congressional standard prescribed by this statute coincides with that of the Constitution, and that the courts are without authority under the statute to set aside as too low any 'reasonable rate' adopted by the Commission which is consistent with the constitutional requirements.

"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear `showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

Neither is this court in a position to substitute its judgment for that of the legislative body, to which the people have delegated the power to, within constitutional limitations, fix rates. Dayton Power & Light Co. v. Public Utilities Commission, 292 U.S. 310, 78 L. Ed. 1267, where the court said:

" 'It is necessary again, in this relation, to distinguish between the legislative and judicial functions.' Los Angeles Gas & E. Corp. Case, supra, p. 314. Much that the framers of the schedule are at liberty to do, this court in the exercise of its supervisory jurisdiction may not require them to do. For the legislative process, at least equally with the judicial, there is an indeterminate penumbra within which choice is uncontrolled."

Appellant subsequent to filing its brief and the record in this cause, filed "Motion for Order Directing Corporation Commission of Oklahoma to take, record, certify and report additional evidence necessary to a decision of constitutional issue of confiscation". The motion is based on alleged facts and conditions occurring and existing subsequent to date of making record in the appeal now under consideration.

In view of the record in this cause both before the Commission and in this court, and being advised that appellant now has pending before the Commission an application for further increase in rates, which could only be based upon additional record, the court is of the opinion that the motion should be and it is denied.

After a careful consideration of the order appealed from, and in light of the record before us, and in view of business conditions, of which we take judicial notice, Atchison, Topeka & Santa Fe Railroad Co. v. United States, 284 U.S. 248, 76 L. Ed. 273, 52 S. Ct. 146, Dayton Power & Light Co. v. Public Utilities Commission, supra, and in face of the particular attacks upon the methods adopted and final conclusions and findings of the Commission, we are of the opinion that the order appealed from does not impair any privilege or immunity secured to appellant by the Constitution of Oklahoma or of the United States and must be and is therefore affirmed.

WELCH, GIBSON, and JOHNSON, JJ., having certified their disqualification, ROY PAUL, WILLIAM B. MOORE, and RAY McNAUGHTON, Sp. JJ., were appointed in their stead.

ARNOLD, C. J., LUTTRELL, V. C. J., and CORN, DAVISON, HALLEY, and O'NEAL, JJ., and PAUL and MOORE, Sp. JJ., concur.