BELL TELEPHONE COMPANY OF NEVADA, A
CORPORATION, APPELLANT, *v.* PUBLIC SERVICE
COMMISSION OF NEVADA, RESPONDENT.

No. 3715

February 16, 1953.                    253 P.2d 602.

*Samuel Platt,* of Reno, and *Francis N. Marshall,* of
San Francisco, for Appellant.

*W. T. Mathews,* Attorney General, *George P. Annand,*
*Wm. N. Dunseath* and *John W. Barrett,* Deputy Attor-
neys General, all of Carson City, for Respondent.

## OPINION

By the Court, BADT, J.:

This appeal requires us to determine whether the telephone rates now in effect as the result of respondent commission's order afford appellant a just and reasonable return. We hold that they do not, that the rates presently enforced are unreasonable, inadequate and confiscatory, and that the collection of the increased rates sought by the utility's new schedules may no longer be suspended.

This proceeding was initiated by the filing by Bell Telephone Company of Nevada on April 14, 1950 of new schedules of intrastate rates and charges calculated to increase its gross annual intrastate revenue by $304,-000.[1] The cities of Reno and Sparks, the county of Washoe and sundry individuals filed protests through their respective counsel and other representatives. After hearing, the commission filed an opinion and order

---

[1] The rights and the obligations of the utility and the public service commission and the procedures to be followed are fixed by N.C.L.1929, secs. 6100–6146. When new rates are filed the commission may suspend their operation pending a hearing. After such hearing the commission "shall have the power to fix * * * such rate or rates * * * as shall be just and reasonable." Id. sec. 6127.

January 4, 1951, holding that because of the then present unsettled world conditions and the inadequacy of present trends as to plant growth, costs and prices, no guide was afforded as to either costs or earnings for the next few years. It held specifically "that applicant's current rates as fixed by order of the commission on November 19, 1949,[2] have not been in effect a sufficient length of time to accurately determine whether or not they should be again revised." It accordingly denied the increase without prejudice. Thereafter a rehearing was granted by the commission upon the company's petition alleging that more recent information demonstrated that its estimate of future earnings had been conservative, and that the present rates had proved inadequate to provide a reasonable return upon intrastate operations for over a year of trial. The general nature of the company's testimony at the rehearing was to show a downward trend of earnings and increased costs due to inflationary forces. On June 25, 1951 the commission again indefinitely suspended the new rates and the utility sought a judicial review by filing its complaint in the district court under the provisions of sec. 33 of the public service commission law, N.C.L.1929, sec. 6133. Additional evidence was presented to the court by the company and by the commission, and the court, pursuant to the statute, ordered the same transmitted to the commission. On December 14, 1951 the commission reaffirmed its previous orders. It specifically based its suspension of the proposed increased rates upon its consideration of the total interstate and intrastate operation. The entire matter was then submitted to the court, and the attorney general (who apparently had not represented the commission in the proceedings

[2]This was the date on which the commission had granted an application, filed June 28, 1949, by the company for an increase in rates. The increase in annual gross intrastate revenue then sought was $617,000. It was granted to the extent of $540,000. This was the first increase sought by the company since its incorporation in 1913.

before it) then moved to remand the case again to the commission for findings (1) of an intrastate rate base[3] and (2) a fair rate of return on the intrastate operation. Over the objection of the utility (which contended that no authority existed for such second remand and that the only action open to the court was to set aside the alleged erroneous order of the commission), the court again remanded the matter to the commission for the purpose of making such findings. Thereafter, on March 5, 1952, the commission specifically found (1) that the fair value of the telephone property and plant used solely for intrastate rate making purposes was $3,499,496, and (2) that the rate of return the utility was entitled to earn on its intrastate base was 6.47%. It found that it was actually obtaining such return and again rejected the rates filed by the company. The district court then, upon submission of the entire matter, filed its opinion

[3] Relying on Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 432, 42 L.Ed. 819, in which Mr. Justice Harlan, speaking for the United States Supreme Court, said: "In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the state that the state can prescribe; and when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for out of, a common fund: and that its capitalization is on its entire line, within and without the state,—can have no application where the state is without authority over rates on [its] entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business."

and decision presented to this court for review on the present appeal. The district court revised the commission's figures in several respects, mostly by way of correction of mathematical errors, found that the company was earning 6.28% on its intrastate operations, sustained the theories and the findings of the commission throughout and dismissed the action.

## ISSUES NARROWED

In the consideration of the appeal as submitted to us and by reason of our conclusions upon certain of the issues which are determinative of the appeal, the court is relieved of the necessity of discussing and determining a number of points to which counsel have devoted much attention in their briefs. We proceed first to eliminate these matters from consideration.

### 1. *Jurisdiction of Court to Make Second Remand to Commission.*

A very material part of the briefs of both parties is devoted to this question. As above noted, after the first hearing by the commission and the filing of the action in the district court and the introduction of further evidence there, that court properly, under the provisions of the statute, remanded the case to the commission for further determination. When the commission thereafter again suspended the operation of the new rates, basing its action upon the company's property and earnings both interstate and intrastate, and the attorney general, in effect confessing error, moved for a further remand for a finding on the intrastate plant and intrastate earnings, the utility strenuously opposed the motion and insisted that the jurisdiction of the court had been exhausted. Some 30 pages of its printed brief in this court are devoted to this point as an assignment of error.

However, as we are satisfied that for other reasons the order of the commission must be set aside, it becomes unnecessary for us to determine the question of the court's jurisdiction to order the second remand.

## 2. *The Method to be Used to Establish the Rate Base.*

There is likewise eliminated from the present appeal any controversy as to the method to be used in arriving at the rate base. In City of Fort Smith v. Southwestern Bell Tel. Co. (Ark.), 247 S.W.2d 474, the court cites Pond on Public Utilities in discussing such separate methods as (a) original cost, (b) cost of reproduction, (c) outstanding capitalization, (d) present value, (e) prudent investment and (f) net earnings. In an informative article by Mr. Everett C. McKeage in the December 1948 American Bar Association Journal, 34 A.B.A. Journal 1096, the author presents a historical analysis of the various tests and rules applied over a long period of years by the United States Supreme Court. The Journal editors, in a preface to the article, refer to the problem of valuation as "one that has troubled the courts and state commissions for many years * * * a field where the 'glorious uncertainty of the law' reigns * * *." The various schedules filed by the utility and the figures used by it in the several hearings before the commission and in the district court and in its brief in this court indicate the rate of return resulting from application of net revenue to a rate base fixed in any one of three ways. 1. The highest rate base results from establishing what is called "current cost rate base."[4] 2. The next highest figure results from applying an "original cost rate base." 3. The third and lowest figure results from applying a "net book cost rate base," which is the actual cost, less the depreciation reserve. While its witnesses were of opinion that current cost rate base was really the fairest method of arriving at the present fair value of the property, the utility, in answer to questions by the court during the oral argument, stated that it did not contend for the use

---

[4]This in turn is not as high a figure as would result from fixing a rate base by way of "reconstruction cost." This would add promotion expense, expense of acquiring the property, brokers' fees and commissions and various items of that nature.

of any single one of these methods. In like manner the commission stated that it did not contend that any one particular method should be used, but insisted that it had the right to use all methods and all available evidence in order to arrive at the fair value of the property devoted to the public service. So we have, as noted, no real contention as to the method to be applied. As the company submits, as agreeable to it, its net book cost rate base, which gives the lowest figure for fair value and indicates the highest return and is therefore most prejudicial to it in the present controversy, and as the commission naturally takes no exception to this method, we have used the same as a basis for the conclusions reached. This is not a judicial determination of the fact that such is the proper method or the only proper method or an exclusive method to use in fixing the rate base of this or any other public utility. In the present case the consideration of a current cost rate base or an original cost rate base would simply result in increasing the finding of present fair value and further diminishing the rate of return, thus unnecessarily presenting a fortiori support of the conclusions reached by us.

### 3. *Fair Rate of Return.*

Upon the second remand to the commission by the court, with directions to find the rate of return to which the company was entitled, the commission found such rate to be 6.47%. The lower court concurred. The company contends that, under the testimony of its expert witnesses, anything under 7.5% would not be a fair rate of return. As we have concluded that the rates established by the commission and approved by the court fix a return to the company at a rate very materially less than 6.47%, it is therefore unnecessary to establish an a fortiori case by determining whether or not under the evidence a rate of return should be established between 6.47% and 7.5%. For the purpose of this opinion we are justified in assuming that in any event any return substantially less than 6.47% is unjust and

unreasonable, but without prejudicing the right of this court in any future proceeding (City of Fort Smith v. Southwestern Bell Tel. Co. (Ark.), 247 S.W.2d 474), under the circumstances there appearing, to consider the question of whether a rate of return in excess of 6.47% might not likewise be deemed unjust and unreasonable, or whether a return of less than 6.47% might not be termed just and reasonable.[5]

### 4. *Debt Financing.*

Before the commission and before the district court, one of the protestants against the increased rates filed a brief in which it contended that a great saving to the telephone users could be effected by debt financing; that a proper and safe ratio of a funded debt to the entire capital structure was perhaps 30% to 40%; that operating with money thus obtained at a possible interest rate of $3\frac{1}{4}$% to $3\frac{1}{2}$%, the telephone users would benefit by the elimination pro tanto of equity capital which might otherwise claim a return of 6% to 7%; that a further saving would be effected through deduction of such interest payments from revenue for income tax purposes. The attorney general, on behalf of the commission, pursued this thought in his cross examination of the utility's witnesses. The utility's reply was that with a financial structure thus weakened, and with danger of not being able to meet interest or principal payments when due and the possibility of a resulting receivership, a return of at least 10% on the equity capital would be necessary to attract investors, and that no saving would result. In its opinion of January 3, 1951, the commission referred to testimony of the expert financial witnesses for the protestants as being too

---

[5]Appellant and respondent have both cited many cases determined by the state commissions, inferior courts and courts of last resort in which varying rates of return have on the one hand been held to be so low as to be confiscatory and on the other hand to provide a just and reasonable return, whether upon net investment, upon stock capital, upon net book cost, upon fair value, etc. Under the circumstances of this case as above recited, it will serve no purpose for us to discuss these cases cited by the parties.

"theoretical or academic especially in regard to bond earnings and interest rates" to be convincing. It was nevertheless inclined to feel that "a funded debt of 40%. would be appropriate." It concluded: "While we do not, on the showing made, accept the applicant's present capital structure as satisfactory and believe that 40% of funded debt at 3¼% or less would save money, it is certain that applicant is constantly advised, if not actually directed, as to its financial operations by the parent company." No part of this situation is in issue before this court, as neither the commission's order nor the court's judgment affirming same seeks any justification or support in the company's complete operation on equity capital, nor did respondent in its brief or oral argument place any reliance on the point. Nor does it appear that the commission took any such possible saving into consideration when it found that 6.47% was a fair return. We therefore refrain from considering it or discussing its merit, if any. But see the opinion of the learned Chief Justice Stanley E. Qua, speaking for the Supreme Judicial Court of Massachusetts in New England Tel. & Tel. Co. v. Department of Public Utilities, 327 Mass. 81, 97 N.E.2d 509. See also Southwestern Bell Tel. Co. v. State, 204 Okla. 225, 230 P.2d 260.

## THE ISSUES

It is obvious that in determining the paramount issue, as to whether the rates in effect as the result of the commission's order and the court's approval thereof produced a just and reasonable return upon the company's property devoted to the public use, a number of factors must be taken into consideration, each of which becomes then an issue in itself. That is to say, as the rate of return is determined by applying the two factors, namely, the valuation given to the property and the net operating revenue returned, the determination of such value and the determination of such net revenue each becomes a major and controlling issue. In considering each of these major issues, however, many elements

34

require determination. Each such determination in turn is an element that could be controlling in our final conclusions. Yet it is not our province to quarrel with methods used by the commission or with methods approved by the district court, no matter how faulty they may have been as means or guides in arriving at sundry determinations involved either in evaluating the property or determining the net return if the end result of the orders made is to permit the company a just and reasonable return. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed 333; N.C.L.1929, sec. 6116, Id. sec. 6127; Southwestern Bell Tel. Co. v. State, 204 Okla. 225, 230 P.2d 260. If, on the other hand, an arbitrary reduction of the rate base or an arbitrary increase of the apparent net earnings results in a false conclusion as to the rate of return and if this is so substantial that a correction of the figures in accord with the undisputed evidence shows that a fair and reasonable return is not being made, it is our duty to correct this situation and to prevent what the courts unanimously agree to be a confiscation of the company's property. We devote ourselves first to a consideration of a determination of the net return.

THE NET RETURN OR BALANCE NET REVENUE

The test period used was the first seven months of 1951, namely, from January 1, 1951 to July 31, 1951. The commission found as follows:

## The Commission's Tabulation

"From analysis of the plaintiff company's annual reports to this Commission and its Exhibits 105 and 106, I & S 117, and Exhibit 5, I & S 112, the Commission finds:

| | Total | Interstate | Intrastate |
|---|---|---|---|
| "(5) Total operating revenue (1 to 4 Exh. 105) | 3,427,140 | 2,158,317 | 1,276,500 |
| "(16) Total operating exp. & taxes (13 to 15 105) | 2,874,424 | 1,730,044 | 1,144,380 |
| "(17) Balance net revenue 7 mo. (5–16 Exh. 105) | 552,716 | 420,596 | 132,120 |
| "Balance net revenue (12 mo.) prorated | 947,520 | 721,020 | 226,500 |
| "Avg. telep. plant in service (Exh. 5 3/31/49 I & S 112) | | | 4,800,600 |
| "Addit. to plant to Dec. 31, 1950 (Note 1) | | | 433,827 |
| "Total Avg. plant in service | | | 5,234,427 |
| "Exh. 5 | | | |
| "Depreciation 3/31/49 I & S 112 | | | 1,346,700 |
| "Depreciation 12/31/50 | | | 388,231 |
| "Total depreciation 7/31/51 | | | 1,734,931 |
| "Total net plant | | | 3,499,496 |
| "% Balance net revenue to average net telephone plant annual basis | | | 6.47% |

"Note 1—Addition computed to December 31, 1950—as annual report of company.

"Additions for first 7 months 1951 have no appreciable effect on revenue.

"Note 2—Item (19) property held for future use not allowed.

"Item (20) working cash capital not allowed. Advance payments from 27697 subscribers (intrastate) give sufficient working cash capital, as indicated by the Company rules and regulations which read:

'Bills for flat rate exchange service for the period specified in the rate schedule may be rendered at the beginning of the billing period and may be rendered monthly, fortnightly, weekly, or at such other intervals as may be considered necessary and are due and payable on presentation.' * * *

"Item (21) materials and supplies are carried as current assets—not fixed to any particular plant, (see balance sheet annual reports) carried as accounts payable to affiliated companies and not allowed for rate purposes."

We are interested, at this point, chiefly in items of the intrastate revenue—the first four items in the right-hand column.

The district court used its own tabulation, but took precisely the same figure for operating revenue, from which it deducted the identical figure for operating expense and taxes, and arrived again at the commission's identical figure for balance net revenue. It amplified the commission's findings of operating expense by itemizing seven individual expense accounts as carried in the company's books and reflected from its exhibits, and arrived at the same result as the commission, in deducting from the total intrastate revenues for the first seven months for 1951 (on which figure the commission, the court and the utility all agree) the amount of $1,144,380 as operating expense. It is this item that draws appellant's fire. The commission did not explain it. The court derived it as follows:

"7/12 of the seven accounts of *1949* operating
   expense ............................................................. $934,910
"53% + Federal income tax 1951 to take
   care of fluctuations in operating
   expenses" ......................................................... 155,085
"23.41% of total other taxes"........................... 54,385

                                                             $1,144,380

The company's proof of intrastate operating
   expense for the first seven months of 1951,
   the period in question, by way of its books,
   its accounts, its exhibits and the testimony
   of its witnesses showed the figure of........ $1,165,200

No one contested the accuracy or the propriety (except as to applying the Separations Manual in segregating the intrastate from the interstate expense) of any of the items making up such expense. It is an aggregate of the many accounts kept in compliance with requirements of the uniform system of accounts.

We can find no justification for the use of any of the three items making up the commission's figure and the court's figure of $1,144,380. To deduct seven months' 1949 operating expense from seven months' 1951 revenue results in a figure that can neither be characterized nor labeled. The second item is neither understandable nor identifiable from the record. The third item applies a ratio of 23.41% as the intrastate ratio that applied *in 1949*. The actual intrastate ratios of intrastate *plant* were as follows: 23.77% on March 31, 1949; 24.96% for 1949; 29.31% for 1950; and 31.65% for the first seven months of 1951, an increase of about one fifth over 1949.

The end result of reducing the intrastate expenses for the trial period of the first seven months of 1951 from the actual expense of $1,165,200, as established by the testimony, the books, records and exhibits, to the sum of $1,144,380, derived by computations from the 1949 reports, was to create a false picture of balance net revenue intrastate for the first seven months of 1951 in the

sum $132,120 against an actual net revenue of $111,300, or, "annualizing" these figures by multiplying the same by 12/7, the commission finds an annual net revenue of $226,500 against what actually appears from the evidence to be only $190,800, a difference in annual net revenue of $35,700. On the total net intrastate plant as calculated by the commission, $3,499,496, this makes a difference of 1.02% and reduces the apparent return of 6.47%, as found by the commission, to 5.45% under the utility's computations.

But even after correcting the erroneous picture of net revenue resulting from deducting 1949 expenses (partially adjusted) from 1951 revenues, we are faced with the necessity for making a further correction. The evidence discloses without contradiction that future net revenues would and will be further greatly reduced by increased operating expense resulting from two factors. The first of these was the so-called fifth round of wage increases. The second was the increase of federal income taxes from 38% to 47% to 52%. Any order as to rates must perforce operate for the future. It cannot act retroactively. A failure to take into consideration the very material increase in operating expenses resulting from these two items again presents a false picture with reference to the future earnings the company may expect. Exhibits reflecting these increases are in the evidence. They are not disputed. To discuss them in detail would serve no purpose. The consequent adjustment of the figure balance net revenue for intrastate service reflecting these items shows a reduction of annual net revenue of $190,800 to an annual net revenue of $152,200. On the basis of the total net intrastate plant as found by the commission in the sum of $3,499,-496, this makes a further difference of 1.10%, further reducing the apparent net return of 6.47% as found by the commission to 4.35% under the utility's computations.

These figures are not the result of speculation or sur-

mise. When the case was being tried to the court on October 15, 1951 and the parties were considering the test period of the first seven months of 1951, it definitely appeared that the fifth round wage increase had started July 29, 1951. Only two days remained within the test period. The company had contracts with six different unions. These contracts provided a fixed wage schedule, with a starting rate and defined "step-ups." Knowing the number of employees of each class and on each "step" of the schedule, it was simply a matter of arithmetic to permit the submission of an exhibit which showed an annual increase in operating expense, though not within the test period, of $166,000 before federal income taxes. A similar situation existed with respect to federal income taxes. A bill was pending before the congress to increase this tax to 52% of net income, retroactive to April 1, 1951. There was little doubt but that it would pass and it subsequently did pass. This situation could not be ignored. Without an honest and intelligent forecast as to probable tax, price and wage levels in the immediate future the fixing of rates would be a futility. McCardle v. Indianapolis Water Co., 272 U.S. 400, 71 L.Ed. 316, 47 S.Ct. 144; Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807.

The foregoing observations however have to do only with the matter of the computation of balance net intrastate revenue. The rate of return is further affected by the commission's methods and conclusions in arriving at the intrastate rate base.

### THE RATE BASE

We refer again to the commission's tabulation and are at this point chiefly interested in the column of figures beginning with the item of $4,800,600 as average plant in service March 31, 1949. This initial figure is derived from the utility's books and is accepted by all parties.

It would seem that by the simple process of adding to this figure the additions to plant and subtracting depreciation to bring the average total net plant into the test period of the first seven months of 1951, the proper result should be derived. The commission purported to follow such method, but used figures which are not supported by the record. Several of the items purporting to show addition to and depreciation of plant are challenged by the company and we find such challenge to be well founded. For example, addition to plant to December 31, 1950 in the sum of $433,827 was apparently derived by applying to actual total interstate and intrastate additions for this period as reflected by the Form M[6] reports of the company (but excluding materials and supplies and working cash hereinafter discussed) the ratio of intrastate to total plant (and this was likewise followed by the court) which existed during 1949. This again obviously presents an artificial figure. If the ratio remained constant it could possibly have been accurately used, assuming that the figures to which it were applied were accurate. But it was not a constant ratio. It

---

[6]The official document is entitled "Annual Report Form M (Telephone Companies)." This is a printed document of some 300 pages or thereabouts containing hundreds, perhaps thousands, of items. It is a complete report of the status of the utility, its property, its receipts and disbursements, its financial transactions, its relation to other companies, etc. It is apparently a full disclosure of everything that the company is and everything that it does. Its complete execution is required by the Federal Communications Commission and was formerly required by the Interstate Commerce Commission. In addition to the filing of two copies of such Form M report with the F.C.C., it is required that the information be taken from the accounts and records of the utility which in turn must be kept in accordance with the uniform system of accounts. Section 6109, N.C.L.1929, not only requires the filing of complete accounts with the Public Service Commission of Nevada but provides that "where any such public utility is required by the United States government to keep accounts in a specified manner, such system shall be followed." Accordingly a copy of the Form M annual report is likewise filed annually with the Public Service Commission of Nevada. Such Public Service Commission is further, under sec. 6109 id., authorized at any time to call for additional information when deemed necessary, and is further authorized to examine the books, accounts, records, minutes and papers of the utility.

varied from year to year, from month to month and from week to week and was readjusted monthly. Under uncontradicted evidence reflected from the company's reports and exhibits and the testimony of its witnesses, the ratio changed materially in 1949, 1950 and the first seven months of 1951 by great additions to the intrastate plant. The company's exhibits, starting, as did the commission, with $4,800,600 on March 31, 1949, show the following increases:

| | |
|---|---|
| To December 31, 1949 | $411,500 |
| January 1, 1950, to December 31, 1950 | 945,700 |
| January 1, 1951, to July 31, 1951 | 841,100[7] |
| | |
| Total increase | $2,198,300 |

This figure brought the rate base July 31, 1951 to $6,998,900.

It is to be noted that the last item above indicates the increase from January 1, 1951 to July 31, 1951 in the sum of $841,100. This item was entirely omitted by the commission and the court, with the commission's notation: "Additions for first seven months, 1951, have no appreciable effect on revenue." The point under discussion was not the revenue but the rate base. A possible construction to be placed on the note in question is that the $841,100 addition to intrastate plant in the first seven months of 1951 did not constitute property that was devoted to the public service intrastate. Yet it appears that these additions to plant corresponded with additions of similar nature in the past and various extensions of the plant. The judgment of the company in installing them is not in any way questioned. Why they were not considered as much a part of the plant devoted to public use as any other parts of the property does not appear. The refusal to consider this uncontradicted evidence was arbitrary and a denial of due process. Baltimore & Ohio R. Co. v. United States, 264

---

[7]The figures represent average amounts for the specific periods. Average figure for a given period is roughly equivalent to a figure representing the median date of that period.

U. S. 258, 44 S.Ct. 317, 68 L.Ed. 667. Or, if the commission's note meant that it was too early to determine whether the 1951 additions to plant would have any effect on future revenues, this still presents no logical or legal reason why the rate base was not increased by such additions.

The record contains no explanation of how the figure of $388,231 for additional depreciation from March 31, 1949 to December 31, 1950 was derived. The accrued depreciation reserve to March 31, 1949 in the sum of $1,346,700 is taken from the company's books and exhibits and is not disputed, but these exhibits show only an increase in depreciation for the first seven months of 1951 in the sum of $254,800. It is significant too that the addition to the depreciation reserve for both the interstate and intrastate plant during the year 1950 was only $404,484, which fact in itself indicates the frailty of the commission's figure.[8] But, irrespective of these observations, the main difficulty with the commission's figures on depreciation as well as on additions to plant is that we can find nothing in the record to support them. Neither does the commission's brief attempt to support any of these figures.

The foregoing discussion reflects a difference as follows, if we use the exhibits, the books and the testimony of appellant:

Plant in service, per appellant.................. $6,998,900
Plant in service, per commission............. 5,234,427

Difference ..................................................... $1,764,473

### THE SEPARATIONS MANUAL

Appellant's above figure of $6,998,900, as plant in service for its intrastate operation, is derived through

---

[8]See dissenting opinion of Justices Brandeis and Holmes in Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission of Missouri, 262 U.S. 276, 43 S.Ct. 544, 552, 67 L.Ed. 981, 31 A.L.R. 807, in which it was said: "For it must be borne in mind

application of what is known as the Separations Manual. In other words, it reflects the current proportion of intrastate usage in ascertaining the plant in service in the rate base. Respondent commission rejects the use of this Manual. Since Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, it has been universally recognized that, as the federal jurisdiction in rate matters is restricted to interstate commerce, so the jurisdiction of the various states is restricted to intrastate rates in their respective jurisdictions. Most of the telephone plant and equipment is used in both interstate and intrastate communications. It is obvious that the wires and cables, the pole lines, the central office equipment, the telephone instruments themselves are for the most part used for the purpose of making calls which originate and end within the state as well as calls originating in the state and crossing one or many state lines. Since the Minnesota Rate Cases, Simpson v. Shepard, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, the accepted law has been that the properties serving such dual purpose must be separated, for rate making purposes in the respective jurisdictions, in accordance with proportionate use. To this end the National Association of Railroad and Utilities Commissioners (NARUC) and the Federal Communications Commission (FCC), for a period commencing in 1941, have worked upon the development of a fixed procedure to be followed for such separations not only of the property but likewise of operating expense. In October, 1951, at Charleston, S.C., a revision of the existing plan of separations was unanimously adopted by NARUC and the revision was approved on November 20, 1951 by FCC. The Separations Manual, as thus revised has come to be known as the Charleston Plan or the Charleston Revision. A very material part of the briefs is occupied with a discussion of the propriety of using the Separations Manual as thus finally adopted.

that depreciation is an annual charge. That accrued on plants constructed in the long years prior to 1914 is much larger than that accruing on the properties installed in the shorter period since."

On the first day of the trial before the court on October 15, 1951 on the utility's suit to set aside the commission's rejection of the company's new proposed rates, the learned district judge expressed his concern with that phase of the case dealing with the Separations Manual. After referring to the fact that the commission, as formerly constituted, had by its decision recognized the Manual, the court noted that after a change in the commission it was apparently not satisfied with the Separations Manual and that the court would be loath to compel a following of the Manual if in fairness to interested parties it appeared that the Manual needed revision. The utility immediately gave notice of its position in this regard, namely, that the Separations Manual furnished to the commission and the court was the only method of separation in evidence. The court commented, "That's the present record," and counsel again stated their position that "the evidence in the case" should be followed.

Thus the commission was charged with notice on the first day of the trial that the utility and the court recognized and insisted upon the proposition that at that point no evidence as to method of separations was in the record except that afforded by the Manual. Such Manual is a printed volume of eighty-seven pages, is based upon the general principle of separations made upon the actual use basis, is divided into major categories of plant, with many subdivisions, and develops a full and complete procedure. Despite the general approval and acceptance of the Separations Manual (including its acceptance by the former personnel of the Public Service Commission of Nevada), we may concede for the sake of argument that the present membership of that commission might find some of its procedures so faulty or unjustified as to move them to reject the same in the face of procedures they might consider more fair or accurate. This however was not done. Respondent does not point to a single item in which the procedures of the Manual are

inaccurate, faulty, unfair or unjust, but states flatly that it rejects the same. It has however applied no formula and has made no suggestion as to what method of separation should be used. The court, in adopting the commission's figures, arrived at them (after some mathematical corrections) by applying to the total plant the ratio of intrastate plant existing in 1949, and applied that figure to the test period of the first seven months of 1951. As the proportion varies not only from year to year but from month to month, it is obvious that a false figure resulted. The proportion of intrastate property and intrastate use increased every year from 1949 to 1951, and in 1951 it was 19.4% higher than in 1949. The figures submitted by the appellant on the other hand were actual figures for the period involved. We have set them out above and indicated the difference between the two figures. Before noting the difference in rate of return resulting from the commission's failure to use the only evidence in the record in allocating to the intrastate rate base the proper proportion of the entire interstate and intrastate plant, some further observations will be in order.

The conclusions expressed by us above as to the necessity for following the Separations Manual in the apportionment of the intrastate operating expense and in the apportionment of property devoted to intrastate use were the inevitable result of many factors appearing in the record. Before the Charleston Commission changes, the Manual originally went into the evidence without objection. The continued use of the Manual over a long period of years was shown. In the earlier hearing the Nevada commission accepted and adopted it, and particularly noted its general acceptance by the state commissions. All of this, as well as the subsequent revision of the Manual, went into the evidence before the court— for the most part without objection. The commission accepted the figure of $4,800,600 as average net plant in service March 31, 1949, and the figure of $1,346,700

accrued depreciation to that date, both of which were the result of applying the Separations Manual. Even the 1949 figures erroneously used for the 1951 test period had been obtained by using the Separations Manual. Despite all this, the commission could possibly have justified its rejection of the Manual by submitting other and better procedures. Re Northwestern Bell Telephone Co. (S.D. P.U.C. 1949), 81 P.U.R. (N.S.) 375, on which reliance is placed by respondent, is deprived of any weight by the further history of that case. In re Northwestern Bell Telephone Co. (S.D.1950), 43 N.W.2d 553; Re Northwestern Bell Telephone Co. (S.D. P.U.C. 1952), 92 P.U.R. (N.S.) 65. A quotation from last-named citation illustrates the problem and the difficulty of its solution:

"Counsel for protestants has argued at great length that the separations procedure prescribed by the Separations Manual of 1947 is without binding force upon the Commission, and should be wholly disregarded, on the alleged ground that the separations methods therein set out are grossly unfair to the states. It is doubtless true that the procedures therein prescribed are not as such binding upon this Commission. They are, however, in quite general use by telephone companies throughout the nation and have been accepted by most Commissions and courts as reasonably satisfactory. Until better methods are developed, adherence to them will probably result in a more satisfactory division of properties, revenues,[9] and expenses as between interstate and intrastate than could be devised by any one Commission. Radical departures therefrom have been frequently condemned by the courts on appeal in this and other states. Protestants did not submit any plan for a more equitable distribution nor offer any exhibit to show how they thought the separations of properties, revenues, and expenses connected with South Dakota telephone operation could be made so as to lighten the load that now is

[9]Separation of revenues is not involved in this case. Interstate revenues are wholly entered as such and so are intrastate revenues.

and in the future will have to be carried by subscribers to telephone service in this state. This and other Commissions have given much consideration to the manual and have for a long time advocated change similar to those adopted by the NARUC convention last October."

Appellant refers us to cases decided by public service commissions in twenty-six different states in 1951 and 1952 (all subsequent to the revision of the Separations Manual as made at the Charleston meeting) in which the procedure of the revised Manual was approved and followed. Respondent has not commented on these cases. We have not examined them, and accept appellant's statement that in all of them the Manual was accepted as the guide for separating interstate and intrastate property and operation.

Respondent relies strongly upon Re Chesapeake & Potomac Telephone Co. of W. Va. (W. Va. P.U.C. 1952) Case No. 3718, decided May 16, 1952. There the West Virginia commission adopted a separations formula submitted by its own expert rather than the Manual, so the case is not in point.[10] However, in many other respects it parallels this case. The West Virginia commission was greatly distressed over the fact that intrastate rates between points in Indiana were greater than interstate rates through the same points and extending many more miles into the state of Ohio. It attributed this situation directly to the separations methods adopted by the Manual, and referred to the Charleston amendments "as being designed to reduce the disparity between interstate and intrastate toll rates" but as having failed to do so. It said: "Any system of separations * * * which

---

[10]This was known as the Honaker method after the name of its sponsor. This method disregarded the theory of actual relative use in applying separations to the station equipment, but applied to that part of the property the intrastate ratio found for the rest of the plant. It does not appear that the commission's opinion (one commissioner dissenting) has as yet been reviewed by the courts. But this same Honaker method was adopted by the Indiana commission, and such action was reversed as not being based on use. Indiana Bell Tel. Co. v. Public Service Commission of Indiana (Cir. Ct. of Marion County, 1952) CCH Utilities Law Rep. (State).

results in a toll of 75 cents for a message from Charleston to Huntington, but a toll of only 55 cents for a message over the same facilities from Charleston through Huntington and then on over into Chesapeake, Ohio, is so obviously erroneous as to warrant its condemnation." Many similar disparities appear in the Nevada rates. Rates from Winnemucca, Nevada, to Reno, Nevada, for example, are higher than rates for service over the same facilities from Winnemucca, through Reno, to Sacramento, California. Appellant shrugs this off, saying in effect: "That has nothing to do with the case. The intrastate plant must pay its own way no matter how great the disparity." Reading between the lines, the West Virginia commission said: "We refuse to be slaves to a rule of law that works a manifest injustice." It sought a relief from the situation by adopting the Honaker method, which, as noted, has to date failed to receive judicial recognition. The Nevada commission senses the same injustice, and the attorney general's oral argument was largely based upon that point. The claim is not devoid of appeal or of merit. Appellant, in its oral argument, insists that this is a problem that arises only after a determination has been made as to the total net revenues necessary to provide a fair rate of return upon the intrastate property. It is not until such determination has been made, says appellant, that the second problem arises of determining "the spread of rates." We are not sure that this is so. We are not sure that the application of a "separations formula" is entirely independent of the establishment of a "spread of rates," particularly in view of the unchallenged statement that the Charleston amendments were designed to reduce the disparity between interstate and intrastate toll rates—an expression that finds repetition in other cases. The present record gives us no opportunity to afford any relief from this situation, but we desire to make it abundantly clear that we do not foreclose further

inquiry into such situation if the matter is again brought before this court.

We return to our computations.

If the intrastate base of $3,499,496, as found by the commission, be corrected to include this figure $1,764,473 (which necessarily results from the fact that it is the only figure finding support in the record and that there is no evidence contra) and is then applied to the net revenue of $152,200, this makes a further deduction of 1.46% from the apparent net return of 6.47% found by the commission, reducing the net return to 2.89%,[11] according to the computations of the utility.

Further reductions of the rate base are made by the commission in its treatment of (1) property held for future telephone use, (2) materials and supplies, (3) working cash and (4) apportionment of depreciation reserve to the intrastate plant. The aggregate of the percent return resulting from the commission's treatment of these items is less than .20%, and as the action of this court is inevitably pointed out as the result of the very material items above discussed, a detailed discussion of the four items last mentioned is not warranted.

### CORPORATE STRUCTURE AND RELATIONSHIP

Respondent senses something sinister in the relationship of appellant to other corporations. All of the corporate stock of Bell Telephone Company of Nevada is owned by Pacific Tel. & Tel. Co., which is in turn almost completely owned by American Tel. & Tel. Co., which company also owns the corporate stock of Western Electric Company and, with it, operates the Bell Laboratories. These laboratories engage in telephone research and furnishing of technical advice to Bell Telephone

---

[11]For the last preceding ten-year period, the earnings of the other three major telephone companies in Nevada, namely, Churchill Co. Tel. & Tel. Co., Elko County Tel. Co. and Southern Nevada Tel. Co. have averaged approximately 10%. During the same period appellant averaged 6.13%.

Company of Nevada, as well as to other operating subsidiaries for which Bell Telephone Company of Nevada pays 1% of its gross revenues. Western Electric Company sells directly to Bell Telephone Company all of the latter's telephone materials and equipment and also acts as purchasing agent for Bell Telephone Company of Nevada of articles which Western Electric does not itself manufacture. We refrain from discussing these relationships in greater detail, as they are not specifically attacked by the commission or the court nor made the basis of the order or judgment on this appeal.[12]

## CONCLUSION

The necessary correction of the commission's erroneous computation of the rate base and of its erroneous computation of net revenue results in reducing the apparent net return of 6.47% as found by the commission to less than half of such return. This we hold to be unjust, unreasonable and confiscatory. From the record it appears that the new rates as filed will themselves provide no greater rate of return than the 6.47% which the commission found was the rate of return that the utility was entitled to earn. It was therefore error for the district court to deny the utility's complaint which sought to set aside the commission's order suspending the increased rates as filed.

The judgment is hereby reversed and the case remanded with directions to enter a judgment vacating and setting aside the order of the Public Service Commission of Nevada of January 4, 1951, and its subsequent order of June 24, 1951.

The record indicates that appellant deposited $300 in

---

[12]The only point made in this regard, in respondent's brief and oral argument, is that since virtually all of the stock of appellant is owned by its parent company, which furnishes necessary cash requirements to the operating company, the element of a net return high enough to be attractive to investors is not applicable. As originally noted in this opinion, however, the determination of the rate of return, other than acceptance of the commission's figure of 6.47%, has been eliminated from the case.

cash in lieu of cost bond on appeal. Such bond is exonerated and the clerk is directed to return the cash deposit to appellant.

EATHER, C. J., and MERRILL, J., concur.