Application of OKLAHOMA NATURAL GAS COMPANY, a Corporation, for an increase in Rates and Charges for Natural Gas Service.

STATE of Oklahoma ex rel. Charles NESBITT, Attorney General, Plaintiff in Error,

v.

OKLAHOMA NATURAL GAS COMPANY, a Corporation, and the Corporation Commission of the State of Oklahoma, Defendants in Error.

No. 40889.

Supreme Court of Oklahoma.

Sept. 21, 1965.

274

Charles Nesbitt, Atty. Gen., F. Burck Bailey, Asst. Atty. Gen., for plaintiff in error.

Robert A. Huffman, Robert W. Langholz, John L. Arrington, Jr., James L. Kincaid, Lupardus, Holliman & Huffman, Tulsa, James G. Welch, Hale, Welch & Hale; T. Murray Robinson, Robinson, Robertson & Barnes, Oklahoma City, for defendant in error, Oklahoma Natural Gas Co.

William L. Anderson, General Counsel, for defendant in error, Corporation Commission of Oklahoma.

JACKSON, Vice Chief Justice.

This is an appeal by the Attorney General from an order of the Corporation Commission granting in part an application of the Oklahoma Natural Gas Com-

pany for an increase in the rates it charges for natural gas service.

The application was filed with the Commission on July 1, 1963, and the order of the Commission was entered on December 19, 1963. Appeal was begun in February, 1964. Thereafter the Attorney General filed a motion to remand in order that the Commission might enter a corrected order reflecting the tax saving accruing to the Company by reason of the Revenue Act of 1964, which substantially reduced federal corporate income taxes. This motion was denied; however, we are informed in later briefs of the parties that, pursuant to an order of the Commission, the Company has already reduced its rates approximately one-half million dollars, thus passing on to the consumers the saving resulting from the reduced income tax rates. Our further consideration of this case will therefore be without regard to the Revenue Act of 1964.

It appears that the Company's operations are not confined solely to the public utility aspect of its business. It also engages in exploration for, and production of, oil and gas, and it partially owns several gasoline plants where liquid hydrocarbons are extracted from "wet" gas and then sold, with the residue "dry" gas then introduced into its pipelines and sold to its utility customers. Rate schedules followed prior to the 1963 application were established pursuant to a Commission order entered in 1957 which was not appealed to this court. In the hearings prior to the 1957 order, the Commission refused to consider the investment, income and expenses of the Company in connection with its "non-utility" operations (production of oil and gas and operation of gasoline plants), but established a rate base founded upon the Company's investment in transmission and distribution properties devoted to its business of furnishing natural gas to the consuming public.

The same procedure was followed in the 1963 hearings. The Company's non-utility operations were not considered in the rate base established by the Commission ($148,850,000) and the Company was directed to file rate schedules sufficient to bring a return of 6.25% upon that rate base. This is the same percentage rate of return that was followed in establishing the 1957 rate schedules. In both the 1957 and 1963 orders, the Commission directed the Company to charge as expense against its utility operations, for the gas which the Company itself produced or obtained through its gasoline plant operations, a sum based on the "fair field price" —that is, a sum equal to what the Company would have had to pay if it had purchased the same amount of gas in the same field on the open market.

It also appears that much of the gas obtained through the Company's non-utility operations is sold in interstate commerce under the jurisdiction of the Federal Power Commission, and that the portion thereof which the Company "buys" for resale to its own utility customers in this state is only a comparatively small percentage of the total amount required to meet the needs of its utility customers. The bulk of the gas the Company sells to its utility customers is purchased on the open market from other producers.

The basic argument of the Attorney General is that the Corporation Commission erred in separating the non-utility aspects of the Company's business (production of oil and gas and the operation of gasoline plants), and in failing to take into account that source of income (non-utility income) for rate making purposes. Instead the Commission in establishing the rate base excluded non-utility property and took into consideration only the value of the Company's transmission and distribution lines and other properties used exclusively in the Company's public utility function and required the non-utility function to share its portion of the expense

of maintaining the central office building and other properties used in connection with the non-utility operations. In addition, it approved the Company's practice of "buying" from its own production, at the "fair field" or arm's-length market price in the field where the gas is produced.

The Attorney General invites attention to Oklahoma Natural Gas Co. v. Corporation Commission (1923), 90 Okl. 84, 86, 216 P. 917, wherein this court held in the third paragraph of the syllabus as follows:

"In a proceeding to establish a rate to be charged by a natural gas utility which produces all or a portion of the gas supplied by it, the cost of its production property and the expenses incident to production must be taken into consideration."

At the time that opinion was written (1923) Oklahoma Natural was a public utility "engaged in the production, purchase, transmission, and distribution of natural gas." It supplied the gas from its production property and conveyed it to its consumers in its own transmission lines. It further appears that Oklahoma Natural, at that time, made no effort to segregate production from its public utility function but combined production, transmission and distribution as one operation into a public utility service. The Corporation Commission included the value of Company's production property in fixing the rate base but argued in this court that it did so only because the record did not supply essential data from which a proper value of purely public utility property could be ascertained. Under the facts in that case where production, transmission, and distribution, had been comingled into one unit of service, both in fact and by Company records, the Commission had no choice but to include "production" as a part of the utility property in establishing a rate base, and this court had no choice but to approve that procedure. Under the facts it was a correct procedure.

The Attorney General also relies upon City of Poteau v. American Indian Oil & Gas Co. (1932), 159 Okl. 240, 18 P.2d 523, as authority for his proposition that production property must be included in fixing the rate base. In the body of that opinion we said:

"* * * In selling gas to the city it (the Company) was not operating two separate systems, one as a distributing system and the other as a producing system, but operated the entire system as one concern. We think that, under the facts and circumstances of this case the property held by the American Indian Oil & Gas Company used and useful in the production of gas should be included in arriving at the value of its property."

In City of Poteau, as in Oklahoma Natural, supra, the public utility had incorporated production, transmission and distribution into one system or unit of public service without allocating the investments and revenues to either, and it was appropriate to consider the investment in "production" and the revenue therefrom in fixing the rate to the customer.

In the instant case "production" was not considered by the Company to be a part of its public service, or as a part of its public utility. Its records were kept so that the Commission could distinguish non-utility property and income from public utility property and income. 17 O.S.1961, § 154. Most of Company's production was either in interstate commerce and subject to the Natural Gas Act, 15 U.S.C.A. § 717 et seq., or was sold by the Company for non-utility purposes.

We are not aware of any constitutional provisions or legislative enactments which undertake to enumerate the kinds and character of property which must be considered in fixing a rate base. In the body of the opinion in Oklahoma Natural Gas Co., supra, we said:

"It will be observed that the act (Chap. 93, S.L.1913, 17 O.S.1961, Sec. 151.) merely defines a public utility.

It does not undertake to enumerate the kinds and character of property to be considered in fixing a rate base."

■ 52 O.S.1961, § 36.1(a) (d), enacted in 1951, defines a "natural gas public utility" but makes no provision for establishing rates to be charged to utility consumers. Absent constitutional and legislative controls it seems reasonably clear that the Corporation Commission may exercise its powers in determining the rate base so long as the result will withstand judicial review.

■ In view of the conclusions reached herein we find it unnecessary to overrule the decisions reached in Oklahoma Natural Gas Co. and in City of Poteau, supra, for the reasons heretofore stated. However, we do find it necessary to modify paragraph number three of our syllabus in Oklahoma Natural Gas Co. v. Corporation Commission, so that it will hold.

"In a proceeding to establish a rate to be charged by a natural gas utility which produces all or a portion of the gas supplied by it, and which utility utilizes all or a substantial portion of its gas production in the operation of its utility as one system for production, transmission and distribution, without segregating production from distribution in its operation, the cost of its production property and the expenses incident to production should be taken into consideration by the Corporation Commission."

By our holding herein we do not mean to hold or infer that a natural gas public utility may as its discretion withhold its non-utility properties from the rate base during periods of time when it is to their interest to do so, and to include them during periods when the non-utility properties are operating at a loss. That issue is not before us and we made no decision thereon.

The Attorney General also argues that a 10% stock dividend of the Company in 1962 had the effect of arbitrarily and fictitiously increasing the financial needs of the Company, and imposing an additional burden upon the rate payers who buy the Company's natural gas.

There was testimony before the Commission that the Company's customary dividend was $1.40 per share, and that the Company intended to continue the payment of this annual amount. The Attorney General says that, for instance, a man who owned 10 shares of stock before the stock dividend would receive annual cash dividends of $14.00, and that after the stock dividend he will receive $15.40. This may be so; however, for reasons set out below, we do not agree that the stock dividend had the effect of increasing the Company's financial needs, or that it had any effect at all upon the rate increase granted by the Commission.

The rate base method of setting rates, stated in an overly-simplified manner, is substantially as follows:

1. Determination of an amount, called the "rate base", upon which the Company should be permitted to make a profit. This amount is based upon actual appraisals of the Company properties, and no consideration is given to the number of shares of stock outstanding, or to the value thereof.

2. Determination of a percentage rate of return (6.25% in this case) to apply to the rate base to determine the amount, in dollars, to be allowed to the Company as profit or net income.

3. Determination of the Company's expected expenses in the conduct of the business, including such things as operating expenses, depreciation, taxes, etc.

4. Determination of rate schedules sufficient to repay to the Company its expenses in the conduct of the business, plus an amount, as profit, as determined in (2) above.

The Attorney General's arguments with respect to the stock dividend would be valid if the record before us showed that proposed cash dividends had been treated as a necessary expense, under (3) above, to be recouped by the Company *in addition to* its permissible profit. Such is not the case. Regardless of the amount of the annual cash dividend per share, and regardless of the number of shares of stock outstanding, any cash dividends paid must come out of the 6.25 percent allowed to the Company for profit, or net income, by the Commission order under review. The Attorney General does not argue, and the record does not show, that 6.25 percent is an unreasonable or unconscionable margin of profit, or that it is more than the "fair return" the Company is entitled to earn under the rule mentioned in Southwestern Bell Telephone Co. v. State, 204 Okl. 225, 230 P.2d 260. On the contrary, there was expert testimony before the Commission to the effect that the Company's profits, even if the rate of return requested by the Company (6.5%) were allowed, would still be slightly below that of 20 other natural gas companies of comparable capitalization and financial structure.

We have noted the other arguments raised by the Attorney General with respect to reasonable financial requirements, sales and earnings, and determination of income deficiency and allocation of expenses. They are, as the Attorney General himself notes with respect to one of them, "largely due to the utility—non-utility dichotomy" and do not require separate discussion in this opinion.

After a careful review of the record before us, we hold that the Commission has regularly pursued its authority and that the findings and conclusions of the Commission are sustained by the law and substantial evidence. Article IX, Sec. 20, Oklahoma Constitution.

The order of the Corporation Commission is therefore affirmed.