## 28038. GEORGIA POWER COMPANY v. GEORGIA PUBLIC SERVICE COMMISSION et al.

GUNTER, Justice. This appeal involves a contest between the Georgia Power Company and the Georgia Public Service Commission relative to rates that can be charged by the public utility for electricity transmitted by it to its customers.

The Georgia Power Company, being a public utility and having a monopoly, in so far as the transmission and sale of electricity is concerned, in its service area, is subject to regulation by the Georgia Public Service Commission. However, regulation of public utilities by the commission is subject to certain limitations, notably constitutional mandates and statutory requirements enacted by the Georgia General Assembly.

The Georgia Constitution provides that the Public Service Commission shall regulate public utilities and that it is vested with such jurisdiction, powers, and duties as may be spelled out in statutes enacted by the General Assembly. However, such statutes enacted by the General Assembly must be consistent with other provisions of the Georgia and Federal Constitutions. Code Ann. § 2-2703.

In 1972 the General Assembly enacted a statute providing for a procedure for utility rate changes. Ga. L. 1972, p. 137 (Code Ann. § 93-307.1). This statute provided that a regulated utility could not make rate changes without giving the commission and the public thirty days notice of the changes to be put in effect. This statute also provided that the commission could suspend the effective date of such rate changes for a period of time not to exceed five months; and during such period of suspension, the commission could conduct hearings to determine whether the changed rates or any portion thereof should be allowed. If the commission did not make an order with respect to the changed rates by the end of the suspension period, then the changed rates became effective and the utility could begin collecting from customers on the basis of the changed rates. If the commission did issue an order with respect to the changed rates before the end of the suspension period, then only such rates as allowed by the commission's order could be charged by the utility to its customers. The statute further provided that the utility had the

burden of showing, before the commission, that any increased rates or charges were just and reasonable. This statute became effective on March 8, 1972.

On June 15, 1972, the utility filed a new rate schedule with the commission which would have the effect of increasing annual operating revenues of the utility in the amount of $47.9 million. The commission suspended the implementation of the new rates until December 15, 1972, and initiated hearings to determine if the increased rates were "just and reasonable." After the hearings the commission issued its order on December 14, 1972, in which it prescribed rates which would produce $17.8 million rather than the utility's filed rate that would produce $47.9 million. The effect of the commission's order was to deny to the utility the right to increase rates so as to produce an additional $47.9 million of revenue, but the order allowed increased rates that would produce an additional $17.8 million of revenue for the utility.

After appropriate rehearing procedures before the commission the utility filed suit in the trial court against the commission to enjoin the enforcement of the latter's order of December 14, 1972. The utility's action in the trial court attacked the commission's order as confiscatory and violative of the due process and just and adequate compensation clauses of both the Federal and Georgia Constitutions for the reason that the rates allowed by the commission's order were insufficient to permit the company the opportunity to earn a fair return on its property dedicated to the public service.

Certain intervenors, in opposition to the utility, were allowed to intervene in the case; and after a trial, the trial judge entered findings of fact, conclusions of law, and a judgment denying the injunctive relief sought by the utility and also denying the relief sought by the intervenors. The effect of the trial court's judgment was to hold that the commission's order of December 14, 1972, was not confiscatory so as to be violative of constitutional and statutory requirements.

The utility has appealed to this court from the adverse decision in the trial court. In our system a utility regulated by the Georgia Public Service Commission has a right to both procedural due process of law and substantive due process of law. In this case there has been adequate notice and an adequate hearing, so the procedural due process issue is not raised. However, the substantive due process issue is raised, the utility contending

that the rate order entered by the commission and affirmed by the trial court does not comport with the basic constitutional protections against confiscation of its property. It is clear that the commission's rate order must accord with substantive due process of law, and it is also clear that the commission's rate order is subject to judicial review so that the courts may determine whether the decision of the commission does comport with substantive due process. If a rate order issued by the commission does not authorize a regulated utility to earn an amount to sufficiently compensate its investors reasonably, to maintain its credit, to attract capital, and to maintain the requisite level of services, then it is the duty of the judiciary to set aside such a rate order as confiscatory and violative of substantive due process of law.

The rate making process for a regulated utility, so as to produce just and reasonable rates for the utility, just and reasonable rates for present customers of the utility, just and reasonable rates for future customers of the utility, and rates that are just and reasonable in the entire public interest, is not an exact science. Yet, after a rate hearing, the commission is called upon to come forth with just such "just and reasonable" rates. The basic question involved is this: how much in total revenue should a public utility be authorized to collect through the rates charged for its sales of service?

It is a general proposition that the total revenue requirement of a regulated utility is the sum total of its proper operating expenses, depreciation expense, taxes, and a reasonable return on the net valuation of its property that is used in the public service. The first three components of this sum total, while often causing problems in the rate making process, do not even come close to causing the problem created by the fourth component, a reasonable return on the net valuation of the utility's property used and useful in the public interest.

The crux of the utility's complaint in this case has to do with the fourth component, its "rate base" and its "rate of return" in rate-making language. The utility has enumerated nine errors in this court allegedly committed by the trial court and, in turn, by the commission in publishing and entering its rate order of December 14, 1972. However, all nine enumerated errors may be summed up by the ninth: The trial court erred in ruling that the commission's rate order was not confiscatory.

## I.

The commission's problem and a reviewing court's problem in a rate case is that the legislature has not and in actuality it probably could not have provided a formula by which "just and reasonable" utility rates can be determined. In rate-making, as in the common law tradition, there is no fixed principle or yardstick to apply in determining what is "just and reasonable." Therefore, commissions and courts have of necessity devised principles or yardsticks, which often change and shift, to apply in reaching a conclusion as to what is a just and reasonable utility rate.

It should be fundamental that in rate-making the use of some standard or method to determine when rates are within a zone of reasonableness and when they are not is required. Otherwise, a reviewing court would have no basis for reviewing a rate authorized by a commission in order to determine whether such rate was constitutionally confiscatory. We do not read Federal Power Comm. v. Hope Natural Gas Co., 320 U. S. 591 (64 SC 281, 88 LE 333), as holding that the method employed in reaching the end result is unimportant. The Hope case says to us that a method or methods, a standard or standards, a principle or principles may be used in reaching the end result, and if the end result comports with substantive due process of law, then the particular method, standard, or principle used in getting there is not controlling. We think that effective judicial review requires the commission to provide clear findings by a well-defined method or standard in reaching its conclusion as to what is a just and reasonable utility rate.

Regardless of the method or standard employed by the commission, there remains the need for some means of testing the end result of the commission's action.

The method used by the commission in this case was to establish the utility's rate base (the net valuation of the utility's property used and useful in the public service) and its rate of return (a percentage of the established rate base).

The matter at issue between the utility and the commission is not the method used; it is the contention of the utility that the commission has established the rate base too low by an approximate half billion dollars and has established the rate of return at 8.26% rather than 8.42% as contended for by the utility.

The utility further argues that the established rate base, too low by half billion dollars, and the established rate of return, too low

as indicated above, result in a revenue deficiency of $61 million. It is to be noted that the rate increase originally asked for was to produce increased revenues of only $47.9 million rather than $61 million. However, the filed schedule was based on a test year ended June 30, 1972, while the test year adopted was the year ended October 31, 1972, and during that four month period the utility contends that its rate base component, construction work in progress, increased from $534 million to $708 million, thus accounting for the total revenue increase from $47.9 million to $61 million.

## II.

Essentially, the utility contends that its rate base should include all of its plant investment, including construction work in progress, as of the end of the test year. The commission has declined to do this, its position being that construction work in progress is not "used and useful" in the service of the public. Instead, the commission has made certain adjustments with respect to the utility's construction work in progress which in normal circumstances would be reasonable and legitimate adjustments to be made by the rate maker. But the utility contends that the circumstances under which it is operating are not normal and that the adjustments made by the commission amount, under the circumstances, to a taking of its property.

The rapid growth in the consumption of electricity in its service area, the increased cost of generating and transmission facilities, and the increased cost of attracting investment capital all add up to the absolute necessity for generating additional revenue through increased rates.

The record shows that the annual expenditures for construction by the utility grew from about $129 million in 1967 to $386 million in 1971; and for the three-year period, 1972-1974, total construction expenditures will approximate $1.5 billion.

In Principles of Public Utility Regulation, Vol. I, p. 203, Professor Priest says: "Expansion of utility properties in a period of rising prices can painfully erode authorized rates of return. Thus the Virginia Supreme Court of Appeals quotes the corporation commission of that commonwealth as having said that a Bell System operating company had demonstrated 'both statistically and graphically' that the 'higher cost of new and replacement plant results in a consistent and almost constant decline in its rate of earnings . . . The result is that the company never is able to earn for a substantial period the level of return contemplated

by the commission and rate cases follow one after another. This factor is called attrition.' The commission's compensating allowance increased the company's rate of return by .23 percent."

In a period of inflation with high interest rates and a high rate of return demanded for the investment of equity capital, compounded by an absolute necessity to rapidly increase generating and transmission facilities, it is legitimately arguable that adjustments in rate base which have been historically approved as legitimate and the establishment of a rate of return which has been historically considered reasonable are rate-making devices that may border on constitutional confiscation.

### III.

We have reviewed this record as carefully as we can, including the pertinent testimony in the transcripts of the commission hearing and in the trial court; none of the members of this court has any special expertise in the field of utility rate-making; but the application of common sense and the principles that we have been able to glean from the reported cases and authorities in the field lead us to conclude that the commission's rate order, approved by the trial court, approaches the area of constitutional confiscation which is violative of substantive due process of law under both the Georgia and Federal Constitutions. However, we hold that the rate order being reviewed lies within that "area of unreasonableness" which is barely above the point of confiscation.

This court is not in the rate-making business; ". . . the power to make such rates in this state is by the Constitution and laws vested exclusively in the Georgia Public Service Commission." *Southern Bell Tel. &c. Co. v. Ga. Public Service Comm.,* 203 Ga. 832 (5) (49 SE2d 38). It is the responsibility of the commission to require a regulated utility to provide a level of service within its service area this year, next year, and in the foreseeable future; consonant with this responsibility the commission must approve utility rates that will produce enough revenue not only for operating expenses but also for the capital costs of the business. Capital for the business includes that required for current and future construction, and its costs include interest and dividends that must be paid to reasonably attract such capital.

It may be that current conditions in Georgia related to both economics and numerical population growth require the

commission to adopt new and different methods, principles, and standards for the rate-making process in arriving at just and reasonable rates for a regulated utility that will enable the latter to receive a fair return on its investment and at the same time provide the level of service in its service area required by the commission in the immediate and foreseeable future. However, such changes, if and when necessary, are to be effected by the commission, utilizing its judgment and expertise in the field of utility regulation.

As for the rate order in the present case, we hold that it is not violative of substantive due process of law, and we affirm the judgment below.

*Judgment affirmed. All the Justices concur, except Grice, P. J., Nichols and Jordan, JJ., who concur specially.*

ARGUED JULY 11, 1973 — DECIDED NOVEMBER 8, 1973.

*Troutman, Sanders, Lockerman & Ashmore, Carl E. Sanders, Tench C. Coxe, Norman L. Underwood, Warren O. Wheeler,* for appellant.

*Arthur K. Bolton, Attorney General, Robert J. Castellani, Timothy J. Sweeney, Lauren O. Buckland, Assistant Attorneys General, Albert M. Horn, Larry W. Thomason, Joel M. Harris, Jr.,* for appellees.

*King & Spalding, Kirk McAlpin, John A. Pickens,* amicus curiae.

NICHOLS, Justice, concurring specially. While I concur in the judgment of the court in this case, I feel that one specific area of the court's opinion needs some additional clarification.

The United States Supreme Court in Federal Power Comm. v. Hope Natural Gas Co., 320 U. S. 591, 605 (64 SC 281, 88 LE 333) set forth certain standards for utility rates which included the following: the rates must (1) permit a fair opportunity to earn a return comparable to that earned by other enterprises of a similar risk, (2) preserve the financial integrity of the utility, and (3) permit the utility to attract capital on a reasonable basis.

My concern is the failure of the commission to take into consideration "Construction Work in Progress."

It has been said that the rates paid by the customers of a utility should be based on the cost of purchasing the product supplied and a fair return to the owners of the utility and that today's customers should not have to pay for facilities to provide for tomorrow's customers.

Such argument may well have been rational in the days of a

static society, when any demand upon such a utility for increased production was small and its "construction work in progress" small when considered with its present production and present income from the sale of its product. Such, however, is not the case here.

It appears undisputed that the growth of the area served by this utility is tremendous and that demand for increased energy is approximately 10% each year over the previous year, which means that it must double its capacity each seven years. The construction cost of new plants also is increasing each year and the "cost of money" has continued to escalate with each passing year. Another facet of this problem is the tremendous amount of time that funds must be tied up between the beginning of construction and the time *any* revenue is produced as a result of providing the product.

The contention is made that such funds should be provided by the utility for a period of years without any current return on investment and that rate payers in the future (after such plant is in operation) should pay rates to provide for a return on such investment. If such funds were being provided for a short period of time, such argument might well have some merit, but where years intervene between the beginning of construction and first operation, such argument cannot stand.

The real question is whether such additional facilities are "used and useful" in providing the product furnished current rate payers. If the question is limited to the product currently furnished, the answer may well be no, but when the question is looked at in its broader scope, to wit: Will the rate payer of today have the product in desired quantities next year when demand by all rate payers will have increased 10% or seven years hence when demand will have doubled, the answer is yes; such additional plants are useful to today's rate payer, and are used today, not to provide the product today but to assure that the product will be provided in the future.

In this day and time the "construction work in progress" should be included in determining what is a reasonable return to the utility in this case and the Georgia Public Service Commission should be made aware that a failure to take such cost into consideration in fixing rates could amount to confiscation.

I am authorized to state that Presiding Justice Grice and Justice Jordan concur in this special concurrence.