58397. ATLANTA GAS LIGHT COMPANY v. GEORGIA PUBLIC SERVICE COMMISSION et al.

ARGUED SEPTEMBER 5, 1979 — DECIDED NOVEMBER 16, 1979 —

*James P. Monacell, Albert G. Norman, Jr., Allen Post,* for appellant.

*Arthur K. Bolton, Attorney General, R. Douglas Lackey, Assistant Attorney General, Sidney L. Moore, Jr., Carl E. Sanders, John Molm, Fred K. Harvey, Jr., C. Christopher Hagy,* for appellees.

DEEN, Chief Judge.

1. There was in the record considerable evidence introduced in an effort to show that the use of natural gas

as a chemical used in the manufacture of fertilizer and other products serving the food industry was in its own way as important to the health of consumers generally as its use in the conventional line of supplying heating and energy requirements. There was also considerable evidence indicating that while the rates at issue here would in the first instance apply only to CNC and Nipro, there were other industrial consumers extant and still others on the horizon who might be eligible for whatever rate schedule was set, and that such rate schedule should therefore be so tailored as to be available to others in substantially the same category. This, however, still pinpoints the rates at issue narrowly within only a part of one of the nine categories to which the rates are applied. As is pointed out in *Ga. Power Co. v. Ga. Public Serv. Comm.*, 231 Ga. 339, 344 (201 SE2d 423)·(1973) the appellate courts are not in the ratemaking business. That case involved a petition for a general rate increase, as to which the standards of constitutional substantive due process demand that the utility be allowed to earn an amount to compensate its investors, maintain its credit, and attract necessary capital as well as to maintain the requisite level of services. Id., p. 341. The appellant here urges that although the testimony in the case indicated that it would be entitled to a return on its investment of 9.57%, it has for the last two years stayed materially under this figure, from which it argues that even if the rate set for these particular users comports with reimbursement for services to other customers (which Atlanta Gas says it does not) it would fail to bring in 9.57% revenue on the percentage of the company investment which (apparently based on the ratio of the number of therms used by CNC and Nipro to the total therms used by all customers during the same period) would "carry its own weight" of allocated costs and return on the investment. We agree that this might be a consideration if the issue before the commission had been a general rate increase. But it appears that Atlanta Gas Light has proposed rate figures which would boost the rate base presently used (which is the same rate base used in the last general rate increase for all consumers) above that of the other consumers in order to ensure that the return from these two customers would

give the desired percentage of profit regardless of the general rate structure as it presently exists. We agree with the appellees that if the utility feels that its rate of return generally is insufficient its remedy is to ask for a general rate increase, but, as is generally held, an attempt to bolster rates piecemeal results in havoc. "If by pleading excessive rate of return parties could. . . have a complete review of rate structure on every occasion that a matter relating to rate arises, the reasonable regulation of rates would be impossible." State v. Carolinas Committee for Industrial Power Rates, 257 N. C. 560 (126 SE2d 325) (1962). The same rule applies to the plea that the rate of return is generally insufficient. We do not find the arguments relating to the overall rate of return on the utility's investment relevant to setting the rate of a single class of customers. It should also be noted that the contract here in dispute arises following a Federal Power Commission case in 1976 involving the amount of additional gas requirements sought by CNC and Nipro the settlement of which provided for increased gas feedstock supplies, followed by lengthy negotiations between the corporations and the utility and a failure of the parties to agree on the formula for supplying the increased demands, but in a close perusal of the record we find nothing by way of either agreement or court order specifying that the new allocation should be bottomed on a rate base different from that generally applicable in the rate structure approved at that time.

2. There was filed with the Public Service Commission's order in this case and forwarded with the record to the superior court the affidavit of James Crudup, director of utilities engineering of the commission, and three exhibits attached thereto, representing the current rate schedules N-9 (industrial interruptible service) and N-15 (preferred interruptible service) (being two other categories of the nine referred to above) and certain arithmetical calculations designed to show the effect in dollars of proposed rate adjustments, all for the year 1976, showing revenues of CNC and Nipro as of the test year (Docket 2943-U), of the last docketed general rate proceeding. These latter included CNC and Nipro rates effective October 18, 1974, and September 30, 1977,

respectively (matters necessarily known to the appellant and to these two corporations) plus the statement of new requirements agreed upon between the parties, plus the multiplication of the number of therms of supplemental supplies by the price per therm. This, by the process of addition of new and supplemental requirements at the stated therm price, yielded the total new revenue in dollars. No new facts were thereby added to the record.

Code § 3A-114 (a) (8) (G) of the Administrative Procedure Act provides that in all contested cases the record shall include all staff memoranda or data submitted to the hearing officer or members of the agency in connection with their consideration of the case. Code § 3A-116 (d) provides: "Official notice may be taken of judicially recognizable facts. In addition, official notice may be taken of technical or scientific facts within the agency's specialized knowledge. Parties shall be notified either before or during the hearing, by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence."

It is strongly urged that failure to introduce this staff memorandum in evidence or to give notice to the public utility and an opportunity to be heard on its contents is in defiance of these requirements of the Act and constitutes reversible error. We agree with the appellant that it would be in all cases advisable to give notice of any staff memoranda which are intended to be sent up with the record in the case. We do not agree that failure to do so in this case will necessitate a reversal. The N-9 and N-15 schedules were schedules under which Atlanta Gas Light operated and with which it was necessarily as familiar as with any other part of the rate proceedings. The arithmetical balance sheet was no more than a reduction to figures of formulae gone into in detail during the hearings. The appellant does not contend that there are any errors of fact contained therein, or any factual material unknown to it, but does contend that it could have introduced other evidence by cross examination and

rebuttal had it known of these memoranda in time. In view of the thrust of the arguments of Atlanta Gas Light for a higher rate, we find nothing in its position which could reasonably be said to have been omitted by reason of not having seen this particular staff memorandum at an earlier time. The memorandum itself is in broad overview a calculation to be used, following known facts, in arriving at a particular arithmetic conclusion.

The construction of statutory language resembling Code § 3A-116 (d) has been considered by other states and failure to adhere strictly to its demands has been held not to raise a conclusive presumption of harmful error. Referring to the use of official notice by the Interstate Commerce Commission, it was held in United States v. Pierce Auto Freight Lines, 327 U. S. 515, 530 (66 SC 687, 90 LE 821) (1946), that such notice has been limited to assure that parties will not be deprived of a fair hearing. "But in doing so it was not undertaken to make a fetish of sticking squarely within the four corners of the specific record in administrative proceedings or of pinning down such agencies, with reference to fact determinations, even more rigidly than the courts in strictly judicial proceedings. On the contrary, in the one case as in the other, the mere fact that the determining body has looked beyond the record proper does not invalidate its action unless substantial prejudice is shown to result." Again, in construing the Administrative Procedure Act as it affected a proceeding before the National Labor Relations Board it was held in NLRB v. Johnson, 310 F2d 550, 552 (6th Cir. 1962): "An administrative agency must confine itself to the record before it and afford opportunity for showings contrary to material facts of which official notice has been taken... However, to constitute fatal error it must appear that an administrative agency's journey outside the record worked substantial prejudice." See also Legislative Utility Consumers Council v. Public Service Comm. 402 A2d 626 (1979).

3. It is further contended that the rate order is arbitrary, capricious, confiscatory, built on a concept foreign to the accepted theory of ratemaking, and totally without supporting evidence. We are aware of, and respect the principals enunciated in, the many cases cited

by the appellant to the effect that this court must closely scrutinize the evidence "for without an appropriate understanding of the case the court cannot properly perform its appellate function," rather than hiding behind an "any evidence" decision. Ethyl Corp. v. E. P. A., 541 F2d 1, 36 (DC Cir. 1976). Nevertheless, where there is competent expert testimony on both sides relating to highly technical results of future actions, appellate courts can and should respect the expertise of the tribunal involved, the burden remaining upon the losing party to demonstrate harmful error. We have held that in determining the rate of the extra requirements of the consumers involved here it was proper to use the figures, so far as applicable, applied overall as established in the last general rate case. So applied, .evidence which supports a decision that the result reached is fair and reasonable, that is, that it bears its proportionate part of the cost of the service plus an amount sufficient to reasonably compensate its investors and maintain its credit, is in accord with substantive due process, but this rule means that "the total revenue requirement of a regulated utility is the sum total of its proper operating expenses, depreciation expense, taxes, and a reasonable return on the net valuation of its property," but does not require that each individual rate must be fixed by a recomputation from month to month or from day to day of the entire structure as a ratio of which the individual rates are fixed. Cf. *Ga. Power Co. v. Ga. Public Serv. Comm.*, 231 Ga. 339, 341, supra. It was specifically urged in *Allied Chemical Corp. v. Ga. Power Co.*, 236 Ga. 548, 550 (224 SE2d 396) (1976) (where the central issue was whether a general rate structure unlawfully discriminated between residential and industrial classes of users because the new rates did not correct, but rather exacerbated, differences in yield returns not related to the cost ratios of supplying the differing kinds of service) that "the difference in charges between industrial users and others is violative of equal protection [because] the Commission must follow a cost of services study in setting rates rather than being significantly guided by non-cost factors." The court emphatically rejected this argument, stating that the process of setting rates need not be

required to follow any particular course so long as the end result does not violate the just-and-reasonable requirement, and the real question at issue is whether the various classes of rates are set upon a rational basis as shown by the evidence. It appears to the court that the differing mathematical results reached by the witnesses for the utility and the consumers in this case are both supported by substantial evidence, show differing approaches to the problem, represent the end limits of each side of the controversy as to which the commission adopted a middle approach. The latter therefore cannot be said to lack justification. It is our opinion that the guidelines used by the commission did in fact show "a well-defined method or standard" for the rates set, although, under *Allied Chemical,* supra, p. 551, even this is not essential where the rate of one customer vis-a-vis others is being considered. This was, in fact, the purpose of the commission in referring to its staff memorandum showing the N-9 and N-15 schedules applicable to other large industrial users of the commodity. The main complaint of the appellant appears to be that it did not agree with the methods of allocation used by the commission, although one of its witnesses indicated that some twenty different methods were in use.

Ratemaking generally is a legislative function which the legislature has delegated to the Public Service Commission. *Sou. Bell Tel. & Tel. Co. v. Ga. Public Serv. Comm.,* 203 Ga. 832, 833 (49 SE2d 38) (1948). We could not if we wished substitute our discretion for that of the commission "unless it be clearly shown that the order is unreasonable, arbitrary, or capricious." *Atlanta Motor Lines v. Ga. Public Serv. Comm.,* 211 Ga. 698, 699 (88 SE2d 387) (1955); Code § 3A-120 (h).

*Judgment of the Superior Court of Fulton County affirming the order of the Georgia Public Service Commission is affirmed. Shulman and Carley, JJ., concur.*