**SOUTHWESTERN PUBLIC SERVICE COMPANY, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. 54667.

Supreme Court of Oklahoma.

Nov. 10, 1981.

---

Rainey, Ross, Rice & Binns by Hugh D. Rice and Michael Cauthron, Oklahoma City, for appellant.

Robert D. Stewart, Jr., Gen. Counsel, Edmond, Eddie M. Pope, Appellate Counsel, Norman, Pat Shore, Legal Intern, Corporation Commission, State of Oklahoma, for appellee.

LAVENDER, Justice:

Southwestern Public Service Company (Southwestern) is an electric power utility serving Oklahoma, Texas, New Mexico, and Kansas. It is the primary source of generated electricity of the Oklahoma panhandle, and serves a number of municipalities, industries and one electric cooperative.

On October 19, 1978, Southwestern filed an application (Cause No. 26469) with the Oklahoma Corporation Commission (Commission) for a general rate increase in which it sought an increase in revenues derived from its retail rates and charges for electric service within the State of Oklahoma in the amount of $1,357,409. On December 1, 1978, Southwestern filed for approval of its fuel adjustment clause (Cause No. 26225). The two causes were consolidated by the Commission. After hearing and on December 17, 1979, the Commission entered Order No. 161495 in which the Commission:

Denied Southwestern's application for a general rate increase in the amount of $1,357,409, but granted a general rate increase in the amount of $379,838; and

Required Southwestern to refund to its Oklahoma customers the sum of $64,030 purportedly resulting from an excess return from Tuco, Inc. which was then a wholly owned subsidiary of Southwestern, which refund was to be affected through Southwestern's fuel adjustment clause.

Southwestern alleges that the order of the Commission violates its rights under the United States Constitution, Amendments V and XIV, and under the Oklahoma Constitution, Art. II, §§ 2, 7, 23 and 24. In weighing the constitutional challenge thus presented, this court will exercise its own independent judgment as to both the law and the facts.[1]

1. Art. 9 § 20 Constitution of State of Oklahoma provides:

"The Supreme Court's review of appealable orders of the Corporation Commission

██ The reasonableness or unreasonableness of rates prescribed by the Commission for a public utility engaged in both interstate and intrastate business must be determined with reference only to the intrastate business done within the State of Oklahoma and the profits derived from the intrastate business. It is by dividing the capital invested in the business in Oklahoma in proportion to the earnings from both interstate and intrastate that the amount of capital invested in intrastate ·business is found, and upon which the company is entitled to a fair return. And it is by dividing the total expense of conducting both its interstate and intrastate business on the same basis that the expense of conducting each is found. If the net profits derived from the intrastate business, as adjusted by the order of the Commission, fails to yield a reasonable return on the investment, the order is unreasonable and unjust, and will be reversed by this court.[2]

██ The constitutional safeguard afforded to a utility is summarized in *Alabama Public Service Com. v. South Cent. Bell Tel. Co.*,[3] as follows: "The just compensation safeguarded to a utility by the 14th Am. to the U.S. Const. is a reasonable return on the value of the property used at the time that is being used for the public service, and rates not sufficient to yield that return are confiscatory. The determination of a fair rate of return is governed by the following legal principles: (1) it cannot be developed by a rule of thumb calculation, but must be determined in the exercise of a fair, enlightened and independent judgment in light of all relevant facts; (2) it must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks, and uncertainties; (3) it must be sufficient to insure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service to the discharge of all its public duties; (4) in determining the reasonableness of its rates it is necessary to consider effect of the rates imposed in the light of the utility's present situation and in light of its requirements and opportunities."[4]

██ The burden of proving the rates fixed by the Commission to be confiscatory is upon the party complaining.[5]

In presenting its case before the Commission, Southwestern used its operations for the calendar year 1977 as the "test year," that is a twelve-month period which has already occurred and in which the actual revenues and expenses of the utility may be closely examined by the utility and the reg-

shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from. ...."

See also *Southwestern Bell Tel. Co. v. State*, 204 Okl. 225, 230 P.2d 260 (1951); *Carter Oil Co. v. State*, 205 Okl. 541, 240 P.2d 787 (1951); *Anderson-Prichard Oil Corp. v. Corporation Com'n*, 205 Okl. 672, 241 P.2d 363 (1951), appeal dismissed, 342 U.S. 938, 72 S.Ct. 562, 96 L.Ed. 698.

2. *Western Union Telegraph Co. v. State*, 31 Okl. 415, 121 P. 1069 (1912).

3. Ala., 348 So.2d 443.

4. *Southwestern Bell Tel. Co. v. State*, 204 Okl. 225, 230 P.2d 260 (1951); *Application of Southwestern Bell Tel. Co.*, Okl., 575 P.2d 624 (1978); *Wiley v. Oklahoma Natural Gas Company*, Okl., 429 P.2d 957 (1967); *Bluefield Waterworks & Improv. Co. v. Public Service Com'n of W. Va.*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *Federal Power Com'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

5. *Application of Southwestern Bell Tel. Co.*, Okl., supra; *Southwestern Bell Tel. Co. v. State*, Okl., supra.

ulators.[6] This was done without objection by the opponents of the rate increase. In its attempts to establish the rate base, Southwestern sought unsuccessfully to add to the test year basis a new generating plant, construction work in progress, water purchase options, and working capital including ad valorem taxes. Southwestern also sought to avoid passing through the benefits of its investment tax credit to its rate payers, and sought to charge its rate payers for gas bought from Tuco, Inc., its wholly owned subsidiary. From the adverse rulings and findings of the Commission, Southwestern has lodged this appeal.

■ In determining whether a rate is reasonable and just, or whether it is confiscatory when constitutionally challenged on that ground, this court is not bound to adhere to a single formula or a combination of formulae, nor is it inextricably committed to a particular point in time or "base year" in establishing a rate base.[7]

As we said in Southwestern Bell Tel. Co. v. State, supra, "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end."[8]

There are, however, as we shall point out, certain requirements of consistency and balance which must be met where deviations from the base year are sought to be interjected.

In the case of Oklahoma Natural Gas Co. v. Corporation Commission,[9] this court said: "In determining whether the rate is reasonable, it is necessary to ascertain the fair value of the property of the appellant used and useful in its public service business at the time the inquiry was made, (citations omitted), for appellant is entitled to a rate which will yield a fair return upon the reasonable value of the property at the time it is being used for the public;" [emphasis added]. In the much later case of Arkansas Gas Co. v. Sun Oil Co. of Pa., Okl., 554 P.2d 14 (1976)[10] we said: "New conditions, such as future gas supplies and new facilities not in service at time of this application, might be basis for future adjustments of rates. Such items are not controlling here. Neither is the overall profit of the company from its conglomerate operations and properties that are not a proper consideration in

**6.** Graphically explained and defined in 52 Bost. U.L.Rev. 791 (1972) "The Use of the Future Test Year in Utility Ratemaking," as follows: "The test year may be analogized to the technique of stopping a movie to examine one frame. By freezing the action of the utility's operations in a convenient time frame, one year, the regulator can observe the inherent interrelationships among investment, expenses and revenues. This observation is meaningful because these dynamic interrelationships are viewed simultaneously, or to use the technical term, in phase."

**7.** Application of Arkansas Louisiana Gas Co., Okl., 558 P.2d 376 (1976); Southwestern Bell Tel. Co. v. State, 204 Okl. 225, 230 P.2d 260 (1951); Lone Star Gas Co. v. Corporation Comm., 170 Okl. 292, 39 P.2d 547 (1934); Application of Southwestern Bell Tel. Co., Okl., 575 P.2d 624 (1978).
The "rate base" or "test year" method of setting rates was defined in Application of Oklahoma Natural Gas Company, Okl., 406 P.2d 273 (1965) as follows:
"1. Determination of an amount, called the 'rate base', upon which the Company should be permitted to make a profit. This amount is based upon actual appraisals of the Com-

pany properties, and no consideration is given to the number of shares of stock outstanding, or to the value thereof.
"2. Determination of a percentage rate of return (6.25% in this case) to apply to the rate based to determine the amount, in dollars, to be allowed to the Company as profit or net income.
"3. Determination of the Company's expected expenses in the conduct of the business, including such things as operating expenses, depreciation, taxes, etc.
"4. Determination of rate schedules sufficient to repay to the Company its expenses in the conduct of the business, plus an amount, as profit, as determined in (2) above."

**8.** Accord, Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Southern Bell Tel. & Tel. Co. v. Georgia Public Service Commission, 203 Ga. 832, 49 S.E.2d 38 (1948); Georgia Power Company v. Georgia Public Service Commission, 231 Ga. 339, 201 S.E.2d 423 (1973).

**9.** 90 Okl. 84, 216 P. 917 (1923).

**10.** Okl., 554 P.2d 14 (1976).

Arkla's rate based value for furnishing gas utilities to its Oklahoma customers."

■ A test year is a mirror view of the past suspended within a limited but definite time frame through which we prophesy its duplication in the future. To alter the image is to risk the distortion for the future. Only the cost of those capital assets which are in actual use during the test year, or whose use is so imminent and certain that they may be said, at least by analogy, to have the quality of working capital may be added to the rate base established by the test year in any event; [11] and then only if appropriate counter-balancing safe guards are applied. As the U.S. Supreme Court said in *Columbus Gas, supra,* "The arrival of that time cannot be known in advance through the application of a formula, but within the margin of a fair discretion must be determined . . . by the triers of the facts in the light of all the circumstances.[12]

■ The Commission must take into consideration not only all increases anticipated in the rate base and operating expense which will be occasioned by the new facility, but must take into account all estimated increases in income resulting therefrom.[13]

■ Where a utility charges interest back against uncompleted projects under construction during the test year, the construction costs incurred during the test year may not be taken into account in fixing its rate base for the reason that to permit it to do so would be to allow it a double rate.[14]

■ In determining whether property held by a utility for anticipated future use should be included in the rate base, there is yet another factor to be weighed, i.e.,

whether the purchase of the property in question was made in pursuance of honest and reasonable business judgment in carrying out some definite plan, for example, or whether the expenditure was dishonest, wasteful or imprudent. This is a question of fact to be determined from the evidence.[15]

Guided by the foregoing principles, we now consider the various items which Southwestern claims should have been included in determining its rate base.

## I.

### CONSTRUCTION COSTS OF THE HARRINGTON GENERATING STATION NO. 2

Southwestern voluntarily selected the calendar year 1977 as the "test year" for the purpose of establishing its rate.

■ Southwestern began the construction of a new coal-fired generating station, Harrington Generating Station No. 2, and associated transmission facilities during the test year. The generating station was completed within twelve months after the end of the test year, and was placed in service six months prior to the filing of the application before the Commission. In its order, the Commission eliminated from the rate base the sum of $1,583,448 representing work in progress on the generating plant, this sum being $544,709 short of the total estimated completion cost of the plant, for the stated reason that the plant "was not used and useful at the end of the test year." Southwestern alleges that the Commission should have deviated from the test year by adding thereto the entire prospective cost

**11.** *Columbus Gas & Fuel Co. v. Public Utilities Com.,* 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403; *Petition of New England Tel. & Tel. Co.,* 115 Vt. 494, 66 A.2d 135 (1949); *Petition of Central Vermont Public Service Corporation,* 116 Vt. 206, 71 A.2d 576 (1950); *Application of Montana-Dakota Utilities Co.,* N.D., 102 N.W.2d 329 (1960); *Kansas Gas & Electric Co. v. State Corp. Com'n,* 218 Kan. 670, 544 P.2d 1396 (1976).

**12.** *Columbus Gas & Fuel Co. v. Public Utilities Com., Id.*

**13.** *Columbus Gas & Fuel Co. v. Public Utilities Com., Id.*

**14.** *Southwestern Bell Tel. Co. v. State, supra,* n. 1; *Petition of Central Vermont Public Service Corporation, supra,* n. 11; *Petition of New England Tel. & Tel. Co., supra,* n. 11; *Application of Montana-Dakota Utilities Co., supra,* n. 11.

**15.** *Petition of New England Tel. & Tel. Co., supra,* n. 11.

of the new generating plant, or in the alternative, the portion of work in progress cost incurred by it during the test year.

While the evidence adequately establishes the fact that the generating plant was a prudent investment and that its usage was certain and imminent within the above guidelines, Southwestern's evidence establishes only the cost of the plant without showing the necessary concomitant income and operating expenses attendant with the projected use of the completed plant. The Commission therefore correctly held that the cost of the plant should be excluded in determining the rate base.

## II.

### WATER PURCHASE OPTIONS ACQUIRED BY SOUTHWESTERN

██ Because of the arid nature of the countryside which it serves, and in anticipation of a need for additional sub-surface water supplies upon completion of its Harrington Generating Station No. 2 in 1987, Southwestern purchased certain water purchase options underlying lands in Texas, said purchases being made in 1976 and 1977, and sought to include these acquisition costs in its rate base. While a utility should be encouraged to expand to meet the anticipated needs of the people for additional services where that expansion is reasonable and the need imminent, neither should today's users be burdened with expansion costs solely attributable to future consumers' possible demands.[16] Here the contemplated need for water rights is too remote in time to enable their acquisition costs to be included in the rate base. In addition, evidence of counter-balancing costs against income resulting from the activation of the generating station are absent from the record. The Commission therefore correctly excluded the water purchase options from the rate base.

## III.

### DEDUCTION OF $79,000 FROM SOUTH-WESTERN'S WORKING CAPITAL

██ Southwestern estimated its cash working capital requirements at 12.5% of operating and maintenance expenses less fuel costs, and alleges error in that the Commission deducted the sum of $79,000 from the working capital thus computed, said sum being one-half of the ad valorem taxes payable by Southwestern. In *Application of Montana-Dakota Utilities Co., supra*, the North Dakota court had before it a specification of error resulting from the public service commission's offsetting against allowances for working capital, materials and supplies, the average monthly balances of the utility's reserves for taxes. There, as here, the utility included in its base rate reserves for taxes. However, it had the free use of these reserve funds for working capital until needed to pay taxes when taxes became due. The North Dakota court held that customer's contributions to tax reserve funds of a utility which funds are employed as working capital until needed should be offset as against funds allowed for working capital. We agree, and find that the Commission correctly deducted the sum of $79,000 from the working capital of Southwestern in establishing its rate base.

## IV.

### COMMISSION'S ALLEGED FAILURE TO COMPLY WITH ART. IX, § 22 OF THE OKLAHOMA CONSTITUTION

Southwestern alleges error in the failure of the Commission to comply with that portion of Article IX, § 22 of the Oklahoma Constitution which provides:

"The Corporation Commission shall, whenever an appeal is taken therefrom, file with the record of the case, and as a part thereof, *a written statement of the reasons upon which the action appealed from was based, and such statement shall*

---

**16.** *Cedar Rapids Gas Light Co. v. Cedar Rapids*, 144 Iowa 426, 120 N.W. 966, affd. 223 U.S. 655,

32 S.Ct. 389, 56 L.Ed. 594.

be read and considered by the Supreme Court, upon disposing of the appeal. * * and the Chairman of the Commission, under the seal of the Commission, shall certify to the Supreme Court all the facts upon which the action appealed from was based, and which may be essential for the prompt decision of the appeal, * * *." [Emphasis added.]

Southwestern complains that the following "findings" of the Commission are constitutionally deficient under Art. IX, § 22:

"5. *Prepayments.* As in its calculation of materials and supplies, (Southwestern) uses a 14 month average of prepayments. The Staff correctly adjusted this calculation to a 13 month average. Additionally, Staff made other adjustments to prepayments which resulted in a total adjustment of $274,444.00.

"*Cash Working Capital.* (Southwestern) estimated its cash working capital requirements at 12.5% of operating and maintenance expense, less fuel costs. Staff accepted this calculation, but deducted $78,944.00, being one-half of the ad valorem taxes payable, for the stated reason that (Southwestern) had the use of such funds prior to payment to the taxing authority.

"6. *Accrued Unbilled Revenues.* (Southwestern) proposed the collection of its accrued unbilled revenues through a surcharge on its rate base or cost of service. Howard W. Motley objected to this and proposed that a working capital allowance be included in the rate base for accrued unbilled revenues. This Staff adjustment in the amount of $349,486.00 is reflected in the total prepayment amount shown in # 5 above.

"11. *Investment Tax Credit* (735,835)" (By which the Commission deducted

$735,835.00 from the rate base for investment tax credit.)

The mandate of the Constitution, Article IX, § 22 is threefold, i.e., (1) the Commission shall file with the record on appeal and as a part thereof a written statement of the reasons upon which the action appealed from was based; (2) the Commission must make findings of fact; and (3) the Chairman of the Commission shall certify to the Supreme Court all the facts upon which the action appealed from was based, and which may be essential for the prompt decision of the appeal. Upon failure to comply, the Supreme Court may remand the case to the Commission with directions to find the facts upon which the Commission bases its order, and to certify the same to the court, before the appeal is finally decided.[17]

And where there is no finding by the Commission on a necessary point, and the evidence in the record is indefinite and unsatisfactory, on review here, the order will not be sustained.[18] On the other hand, this court has held that substantial compliance with the requirements of § 22, Art. IX of the Oklahoma Constitution is sufficient.[19]

In *Cameron v. Corporation Commission,* Okl., 414 P.2d 266 (1966) we held that an Examiner's report containing a resume of the evidence presented before the Commission wherein it was apparent to the Supreme Court that the facts and the reasons for the Commission's order were obvious or contained within the Examiner's report constituted sufficient "findings" and "reasons" to comply with § 22, Art. IX, therein observing that "proceedings before the Commission are rather informal, and their validity is not tested by all the technical rules that obtain in court trials."[20]

**17.** *Muskogee Gas & Electric Co. v. State,* 81 Okl. 176, 186 P. 730 (1920); *Pioneer T. & T. Co. v. Westenhaver et al.,* 23 Okl. 226, 99 P. 1019.

**18.** *C.R.I. & P. Ry. v. State,* 24 Okl. 370, 103 P. 617, 24 L.R.A. (N.S.) 393; *Atchison T. & S.F. Ry. Co. v. State,* 27 Okl. 820, 117 P. 330.

**19.** *Southwestern Cotton Oil Co. v. Farmers' U. Co-op. G. Co.,* 165 Okl. 31, 24 P.2d 658.

**20.** In accord, *Cameron v. Corporation Commission,* Okl., 414 P.2d 266 (1966); *Sinclair Oil & Gas Company v. Corporation Commission,* Okl., 378 P.2d 847 (1963), wherein the court further determined that it would have been impracticable and would have added nothing to the order of the Commission to detail the many considerations which went into making up the findings announced.

A reconciliation of what may seem, at least superficially, to be inconsistencies in the holdings of the cases of this court in construing § 22, Art. IX and in applying it to appeals from orders of the Commission becomes apparent when one considers the objective and the purpose of the Constitutional provision. While the Commission is not subject to the Administrative Procedures Act of 1963, 75 O.S.Supp.1963, § 301, except § 304(a) thereof, relative to filing of its rules,[21] the decisions of this court regarding similar requirements of that act are illuminating.[22]

In *Brown v. Banking Board*, Okl., 512 P.2d 166 (1973) this court had under consideration on appeal from a judgment of the Court of Bank Review certain findings of that board. What we said there applies by analogy to the case now before us:

"In *Allied Investment Company, Inc., v. Oklahoma Securities Commission*, 451 P.2d 952 (Okl.1969) it was stated:

'A statutory requirement that an administrative agency make findings of fact and conclusions of law is a matter of substance and not a mere technicality, and if the administrative agency fails to supply such findings, its determinations will not be sustained.'

"Also, it is fundamental that an absence of required findings is fatal to the validity of the administrative decisions regardless of whether there may be in the record evidence to support proper findings. *Anglo-Canadian Shipping Co. v. Federal Maritime Commission*, 310 F.2d 606 (9th Cir. 1962).

"Findings should be sufficient in content to apprise the parties, the Court of Bank Review, and if necessary, the Supreme Court of the actual basis of the action by the Board, in order that it may be determined whether the Board's decision has support of 'substantial evidence' and the law, and to insure against arbitrariness. Findings in general terms are not sufficient.

"The purpose of requiring findings of facts has been reiterated many times by this Court:

'Findings of administrative agency acting in a quasi-judicial capacity should be a recitation of basic or underlying facts drawn from the evidence, and must be free from ambiguity which raises doubt as to whether board proceeded upon correct legal theory, and must be sufficiently stated to enable reviewing court to intelligently review order and ascertain if facts upon which order is based afford reasonable basis for order.' *State v. Guardian Funeral Home* (Okl.1967), 429 P.2d 732, Syllabus 3. See also *Oklahoma Inspection Bureau v. Board of Property and Casualty Rates* (Okl.1965) 406 P.2d 453." [23]

█ While this court is not precluded from making a review of the whole record and entering the appropriate order indicated by the record in its entirety,[24] where, as here, the matters involved are of a technical nature and encompass an evaluation of expertise indigenous to the work of the Commission, we decline to do so.[25] Since

**21.** *Cameron v. Corporation Commission, supra.*

**22.** 75 O.S.Supp.1963 § 312 provides: A final order adverse to a party in an individual proceeding shall be in writing or stated in the record. A final order shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings."

**23.** Accord, *Oklahoma Pioneer, Inc. v. Carpenter*, Okl., 617 P.2d 210 (1980); *State v. Guardian Funeral Home*, Okl., 429 P.2d 732 (1967); *Allied Investment Co. v. Oklahoma Securities Com'n*, Okl., 451 P.2d 952 (1969); *McCarthy v. Forbes Painting & Decorating Co.*, 200 Okl. 555, 198 P.2d 212 (1948); *Special Indem. Fund v. Knight*, 201 Okl. 24, 200 P.2d 766; *Fishbach & Moore of Tex. v. State Indus. Commission*, 201 Okl. 170, 203 P.2d 422; *Boen v. State Indus. Commission*, 202 Okl. 258, 212 P.2d 457; *Special Indem. Fund of Okl. v. Hewes*, 202 Okl. 356, 214 P.2d 240.

**24.** See footnote 1, *supra*, and *Brown v. Banking Board, supra.*

**25.** *State of New York v. United States*, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492.

the findings of the Commission pertaining to Prepayments, Cash Working Capital, Accrued Unbilled Revenues and Investment Tax Credit leave too much to speculation and conjecture as to what precisely the Commission purported to find and its reasons therefor, the cause must be remanded to the Commission for findings and certification in accordance with the Oklahoma Constitution, Art. IX, § 22.

## V.

### COMMISSION'S RETROACTIVE REBATE OF SOUTHWESTERN'S FUEL ADJUSTMENT CLAUSE

In Order No. 161495 the Commission found that Tuco, Inc., a wholly owned subsidiary of Southwestern, had earned an excess return from payments by Southwestern for fuel during the test year. The Commission staff computed the rate of return for Tuco at 16.03%, whereas Southwestern had a rate of return of 8.73%. The Commission granted Tuco the same rate of return as Southwestern (14%), and ordered a refund of the amount exceeding 14% ($64,030) to be rebated by adjustment in Southwestern's fuel adjustment clause. Southwestern alleges the Commission's order is arbitrary and contrary to the law and the evidence. It further contends that the Commission had no power to order a refund because this amounts to a retroactive setting of the rates of Southwestern.

Both the power and duty of the Commission to conduct detailed investigation of Tuco's income, expenses and investments in order to determine whether the rates charged by Southwestern in connection with its fuel adjustment clause are just and reasonable are mandated by 17 O.S.Supp. 1977, § 263.

In determining a just and reasonable rate, a balance must be struck between two extremes. On the one hand, common ownership is not of itself sufficient ground for disregarding agreements between a utility and its subsidiary fixing rates for the subsidiary's product. Even though the subsidiary may be receiving a larger share of the profits, the utility may nevertheless be receiving substantial benefits from the contract, and the utility may not be able to secure better terms elsewhere.[26]

On the other hand, a public utility cannot make a rate confiscatory by reducing its net earnings through the device of a contract unduly favoring a subsidiary or a corporation owned by its stockholders.[27]

We next deal with the question of whether the Commission, having determined that Tuco was charging Southwestern an excessive rate for the sale of fuel to it, properly ordered the excess charged in the past rebated through an adjustment in Southwestern's fuel adjustment clause.

Southwestern points out the fact that its fuel adjustment clause was established by Commission Order No. 117720 in 1976, and that its payments to Tuco were in conformity with that order. Under such circumstances, no power to award reparations is vested in the Commission by virtue of 17 O.S.1971, § 121.[28] Neither is the power to make retroactive adjustments in the fuel adjustment clause established by final order of the Commission to be found in the "Fuel Adjustment Clause" statutes

26. *United Fuel & Gas Co. v. Railroad Com.*, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390.

27. *United Fuel & Gas Co. v. Railroad Com., id.*

28. 17 O.S.1971 § 121 provides:
"The Corporation Commission is hereby vested with the power of a court of record to determine: First, the amount of refund due in all cases where any public service corporation, person, or firm, as defined by the Constitution, charges an amount for any service rendered by such public service corporation, person, or firm, in excess of the lawful rate in force at the time such charge was made, or may thereafter be declared to be the legal rate which should have been applied to the service rendered; and second, to whom the overcharge should be paid. Laws 1913, ch. 10, p. 10, § 1."
In construing this section, this court held in *St. Louis-San Francisco Ry. Co. v. State*, 155 Okl. 236, 8 P.2d 744, that the Commission is without power to award reparations for payments made in accordance with rates fixed by a final order of the Commission.

(17 O.S.Supp.1977, §§ 251–264). Absent express statutory authority to adjust rates retroactive to the effective date of a final order of the Commission establishing the rate, no such power exists.[29] Therefore the Commission erred in ordering a rebate of excessive charges made by Tuco to Southwestern for fuel purchases covering the period prior to the effective date of the order determining the charges to be excessive.

The cause is remanded to the Oklahoma Corporation Commission for the making of findings, reasons therefor and certification as required by Art. IX, § 22 of the Constitution of the State of Oklahoma, and for the purpose of making an appropriate adjustment in the rate base after deleting therefrom the $64,030 recoupment erroneously ordered to be obtained through the fuel adjustment clause. The orders and judgment of the Commission are otherwise affirmed.

IRWIN, C. J., BARNES, V. C. J., and SIMMS and HARGRAVE, JJ., concur.

DOOLIN and OPALA, JJ., concur in part and dissent in part.

HODGES, J., dissents to Parts I and II and concurs in the other portions of the opinion.

WILLIAMS, J., certified his disqualification.

DOOLIN, Justice, concurring in part; dissenting in part:

I concur with majority in ordering remand on all points and issues, except I would hold the Corporation Commission, under its unique constitutional position and powers, may make valid orders with reference to fuel adjustment matters.

**29.** 73 C.J.S., Public Utilities, § 41(4), p. 1087, et seq.